699 So.2d 365 (1997)
Melvin GRAHAM
v.
WILLIS-KNIGHTON MEDICAL CENTER, et al.
No. 97-C-0188.
Supreme Court of Louisiana.
September 9, 1997.
Rehearing Denied October 10, 1997.
Albert M. Hand, Jr., Cook, Yancy, King & Galloway, Shreveport, for Applicant.
John L. Hammons, Nelson & Hammons, Shreveport, for Respondent.
LEMMON, Justice.
This is a medical malpractice action arising from treatment of a gunshot injury. Dr. *366 Forrest Wright, the general surgeon who performed an emergency repair of plaintiff's lacerated intestine, properly stopped the hemorrhaging by ligating the severed external iliac artery that supplied most of the blood to plaintiff's right leg, but negligently failed to summon the on-call vascular surgeon to revascularize the limb upon completion of the intestinal repair. In this action, plaintiff asserted that the delay caused by Dr. Wright in completion of the revascularization procedure of the leg caused him to lose his leg or to lose the chance of saving his leg from amputation.
The primary issue which prompted our grant of certiorari is the extent of plaintiff's burden of proving causation of the claimed damages after Dr. Wright's insurer paid $100,000 in settlement of the claim against him, thereby triggering an admission of liability under La.Rev.Stat. 40:1299.42 C(5).

I
At approximately 9:35 p.m. on August 9, 1991, the Sheriff's office received notice that plaintiff had been shot in the abdomen. A helicopter transported plaintiff to Willis-Knighton Medical Center, where he arrived at approximately 10:30 p.m. and was treated by Dr. Wright. Upon surgically opening plaintiff's abdomen,[1] Dr. Wright determined that the bullet had lacerated plaintiff's small intestine and had also severed his right external iliac artery. Dr. Wright clamped the artery to stop the internal bleeding, and at 11:40 p.m. he commenced the repair of the intestine. Because the right external iliac artery supplies ninety percent or more of the blood to the right leg, the bullet's severing the artery cut off most of the blood supply to the leg and necessitated revascularization to restore blood flow to the leg as soon as possible. However, Dr. Wright did not summon the on-call vascular surgeon to perform revascularization of the leg upon completion of the intestinal procedure.
The intestinal surgery was completed at 1:30 a.m., and plaintiff was sent to the recovery room. Dr. Wright eventually arranged to transfer plaintiff to the Louisiana State University Medical Center (LSUMC) for the revascularization procedure, signing a transfer order at about 3:30 a.m. For reasons not shown in the record, plaintiff did not arrive at LSUMC until 5:15 a.m., almost four hours after completion of the intestinal surgery.
At LSUMC, plaintiff was immediately administered a second anesthesia. The trauma surgeon then performed the procedure to revasculate plaintiff's leg, completing the surgery in one hour and three minutes. However, because of the lengthy period of time between the occurrence of the injury and the completion of the revascularization, plaintiff's leg eventually had to be amputated at the hip joint.
Plaintiff filed a medical malpractice claim against Dr. Wright, contending that the delay caused by Dr. Wright deprived him of the chance of a better result from the revascularization and thereby deprived him of a chance to save his leg from amputation. Dr. Wright's insurer paid $100,000 in settlement of the claim before the medical review panel convened. The court approved the settlement, and plaintiff ultimately went to trial against the Patient's Compensation Fund.
After trial on the merits, the trial judge rendered judgment in favor of the Fund. Payment of the $100,000, the judge reasoned, constituted "an admission that the applicable standard of care was breached by the defendants in this case, and that the plaintiff has sustained damages as a result" of Dr. Wright's failure to arrange for the vascular surgery to be performed at Willis-Knighton immediately after completion of the intestinal repair. However, the judge further found that plaintiff failed to prove that "Mr. Graham, more probably than not, lost a chance of better recovery as a result of Dr. Wright's delay in the revascularization process." Noting that there was a limited "window of opportunity" for successful revascularization of the leg, the judge stated that the chances for a successful procedure "abruptly diminished" at the close of this "window" which occurred, according to the judge, before the 1:30 a.m. completion of the intestinal surgery.
*367 Although ruling that plaintiff was not entitled to damages for loss of his leg, the judge nevertheless recognized that plaintiff did sustain some additional pain and suffering from being conscious during the interval between the two surgeries and some additional risk from the second anesthesia, but concluded that those damages did not exceed the $100,000 already paid.
The court of appeal reversed the judgment of the district court and rendered judgment against the Fund for $400,000 in general damages for loss of the leg and more than $69,000 in medical expenses related to that loss, subject to a credit for the $100,000 settlement. 95-27,338 (La.App.2d Cir. 9/29/95); 662 So.2d 161. Referring to the decision in Jones v. St. Francis Cabrini Hosp., 94-2217 (La.4/10/95); 652 So.2d 1331, the court stated that Dr. Wright's settlement for $100,000 was an admission of liability for the original harm caused by the malpractice and that "the fact of settlement forecloses any further consideration of cause-in-fact, duty, breach and harm." 95-27,338 at 8; 662 So.2d at 166. Accordingly, the court held that the trial court committed legal error by allowing the Fund to relitigate the issues of causation and original harm, concluding that the "original harm, liability for which was admitted in the settlement, was the loss of Graham's leg" 95-27,338 at 8; 662 So.2d at 166 (emphasis in original).[2] The court then proceeded to fix damages for this loss based on the record medical evidence.
Action on the Fund's application for certiorari to this court was deferred while this court heard and decided the case of Pendleton v. Barrett, 95-2066 (La.5/31/96); 675 So.2d 720, in which the court addressed the issue of the burden of proving causation in medical malpractice cases after a settlement for $100,000. After the Pendleton decision, this court remanded the present case back to the court of appeal for reconsideration in the light of that decision. 95-2881 (La.11/25/96); 683 So.2d 1219.
On remand, the court of appeal reinstated its original opinion, concluding there was no reason, based on Pendleton and on the review of the record, "to alter or deviate from the discussion in our original opinions." 96-27,338 (La.App.2d Cir. 12/20/96); 686 So.2d 955.[3]
This court granted certiorari to provide further guidance to the lower courts and to attorneys in this developing area of medical malpractice law. 97-0188 (La. 3/21/97); 691 So.2d 69.

II
La.Rev.Stat. 40:1299.44 C(5) provides in part:
At the hearing the board, the claimant, and the insurer of the health care provider or the self-insured health care provider as the case may be, may introduce relevant evidence to enable the court to determine whether or not the petition should be approved if it is submitted on agreement without objections. If the board, the insurer of the health care provider or the self-insured health care provider as the case may be, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, then the court shall determine the amount of claimant's damages, if any, in excess of the amount already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and render a finding and judgment accordingly. In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits to one hundred thousand dollars, or where the self-insured health care *368 provider has paid one hundred thousand dollars.
Section 1299.44 C(5)'s provision that payment by the tortfeasor, or by his or her insurer, of $100,000 in settlement of the medical malpractice claim constitutes an admission of "the liability of the health care provider" is perhaps the only benefit that medical malpractice victims derived from the Medical Malpractice Act. Virtually all of the other provisions of the Act were intended to benefit health care providers.
Against that background, this court first construed Section 1299.44 C(5) in Stuka v. Fleming, 561 So.2d 1371(La.), cert. denied, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990). There, the medical malpractice victim settled for $100,000 with one of three associated doctors who had been joined as defendants, and the other doctors were dismissed from the action as part of the settlement. This court rejected the Fund's contention that it could still litigate the issue of liability because a payment of $100,000 had not been made on behalf of each named health care provider.[4] Interpreting the overall statute as dispensing entirely with the litigation of liability between the victim and the Fund after one health care provider has paid $100,000 in settlement, this court held that once payment by one health care provider has triggered the statutory admission of liability, the Fund cannot contest that admission, and "the only issue thereafter between the victim and the Fund is the amount of damages sustained by the victim as a result of the admitted malpractice." 561 So.2d at 1374 (emphasis added). See also Koslowski v. Sanchez, 576 So.2d 470 (La.1991).
The decision in Jones v. St. Francis Cabrini Hosp., 94-2217 (La.4/10/95); 652 So.2d 1331, involved a $100,000 settlement of a medical malpractice claim that presented several injuries and two acts of malpractice. The seventy-five-year-old Mrs. Jones had undergone surgical repair of a hip fracture. Several days after the surgery, she sustained a pararectal tear through alleged negligence during post-surgical testing. The tear necessitated a colostomy, which the doctor expected to reverse in six to eight weeks. However, Mrs. Jones sustained further separation of the hip bone in a fall allegedly caused by the negligence of a nurse and had difficulty in convalescing. When Mrs. Jones underwent reversal of the colostomy, severe complications developed, and she eventually died from causes directly related to the reversal procedure.
In an action by her heirs seeking damages caused by the rectal perforation and the fall, the hospital settled for $100,000, and the case proceeded to trial against the Fund. The jury returned a verdict awarding the plaintiffs $50,000 for Mrs. Jones' pain and suffering as well as for one survivor's mental anguish, but did not award any wrongful death damages. The court of appeal also refused to award any damages for wrongful death.
Applying the duty-risk analysis, this court determined that the reversal of the colostomy and Mrs. Jones' subsequent death were causally related to the original harm (the pararectal tear). This court concluded that "the rectal perforation (for which [the hospital] statutorily admitted liability) was clearly a cause in fact of the reversal of the colostomy, since the reversal would not have been necessary but for the rectal perforation and the resulting colostomy." 94-2217 at 8; 652 So.2d at 1336. It was reasonably foreseeable, this court further noted, that Mrs. Jones would seek reversal of the colostomy, particularly in the light of her difficulty in managing the colostomy bag because of her arthritis. Accordingly, this court awarded wrongful death damages to Mrs. Jones' statutory heirs.
In Pendleton v. Barrett, 95-2066 (La.5/31/96); 675 So.2d 720, this court directly addressed the issue of the burden of proving a causal relationship between the fault statutorily admitted by a $100,000 settlement and the damages claimed by the plaintiff. The tort victim in Pendleton consulted the health care provider about a lump in her breast. The doctor performed a mammogram and reported the results as negative, and a biopsy performed one month later *369 when the lump continued to grow was also reported as negative. The lump still continued to grow, and the doctor removed the lump approximately six weeks later. Pathology tests showed that the tumor was malignant. Tumors were discovered shortly thereafter in many other portions of the victim's body. The victim died after filing suit, and her husband and child were substituted as plaintiffs.
After the plaintiffs and the health care provider's insurer settled the case by payment of $100,000, the plaintiffs were scheduled to proceed to trial against the Fund to recover the damages in excess of $100,000. Prior to the trial, the Fund raised several issues, including whether the plaintiffs had the burden of proving that any or all of the claimed damages were caused by the statutorily admitted malpractice of the doctor. The trial court ruled pre-trial that the settlement payment of $100,000 foreclosed the Fund from contesting either liability for or causation of the damages claimed by the plaintiffs.
On supervisory writs, the court of appeal reversed the pre-trial ruling in part and held, in an unpublished opinion, that the plaintiffs have "the burden of presenting evidence to determine what damages were caused by the health care provider's admitted liability and determine what amount, if any, is to be paid from the Patient's Compensation Fund."
This court granted certiorari, an unusual occurrence for a case still in pre-trial posture. Discussing both sides of the issue of the burden of proving causation of claimed damages after a statutory admission of liability by payment of $100,000, the majority first observed that the statutory admission of liability becomes less significant if the plaintiff is required to prove the causal connection between all of the damages and the admitted malpractice. On the other hand, if the plaintiff is not required to offer any proof of causation as to any medical conditions existing after the surgery, then the statutory admission of liability could expose the Fund to liability for secondary medical conditions totally unrelated to the malpractice. Attempting to reach a middle ground, the majority held:
[W]hen a health care provider admits and establishes liability by payment of $100,000 under the Medical Malpractice Act, under La.R.S. 40:1299.44(C)(5), claimant is relieved of the obligation to prove a causal connection between the admitted malpractice and claimant's original and primary harm. However, if claimant is asserting claims for secondary damages, then he has the burden, notwithstanding admitted liability by virtue of the $100,000 settlement and La.R.S. 40:1299.44(C)(5), to prove that this secondary harm was caused by the medical negligence.
95-2066 at 18-19; 675 So.2d at 730. The majority then placed the duty on the trial judge to distinguish between the original or apparent harm, which the admission of liability encompasses, and the secondary harm, concerning which the plaintiff continues to bear the burden of proof. This determination, the majority pointed out, shall be made by "a close review of the record consisting of the pleadings, discovery and any trial proceedings." 95-2066 at 19; 675 So.2d at 730. The case was remanded to the trial court to make this determination, apparently pre-trial, after which the Fund would be liable in damages for any primary harm and the plaintiff would bear the burden at the subsequent trial of proving, under a duty-risk analysis, the causal connection between the health care provider's breach of duty and any secondary harm.
The dissenters in the four-to-three decision interpreted the legislative intent of the term "liability" in Section 1299.44 C(5) to denote an admission of liability both for the malpractice and for damages caused by the malpractice of at least $100,000. Under this interpretation, the medical malpractice victim, just as the victim in any other tort action in which "liability" is admitted, has the burden of proving that the tortfeasor's admitted breach of the standard of care caused damages in excess of the amount paid in settlement.

III
Although the Pendleton case was before this court in a pre-trial posture, the present case has been fully tried. Since the present *370 case was tried before the Pendleton decision, there was no pre-trial determination of primary harm and secondary harm. Moreover, Pendleton contemplates a hearing (generally pre-trial) at which the distinction between primary and secondary harm is drawn by review of "pleadings, discovery and any trial proceedings." It is therefore appropriate in the present case that we begin our analysis by reviewing the medical evidence that was presented at trial.
Dr. Wright testified that when he opened plaintiff's abdomen to control the hemorrhaging, he clamped the severed artery to control blood loss. He then repaired the lacerations in the intestine in order to prevent continued fecal contamination. Upon completion of the intestinal repair, he determined that he could not repair the artery internally, and he proceeded to ligate the artery, to close the abdomen, and to send plaintiff to the recovery room. At no time did Dr. Wright attempt to contact the vascular surgeon who was on call at Willis-Knighton to arrange for an external revascularization to be performed there. Only after plaintiff was sent to the recovery room did Dr. Wright attempt to contact someone at LSUMC to handle the vascular injury at that hospital.
All of the medical experts agreed that the proper procedure, upon discovering the severed artery, would have been to instruct the nurse to summon the vascular surgeon who was on call at Willis-Knighton and to have the vascular surgeon prepared to perform external by-pass revascularization there immediately upon completion of the intestinal surgery. The timing of the revascularization procedure was critical to the chances of its success, the experts agreed, and the chances of recovery decrease with the passage of time between the trauma and the completion of the revascularization.
Dr. Lou Smith, a general surgeon specializing in traumatic injuries, performed the revascularization procedure at LSUMC. The hospital staff, having been advised by Dr. Wright of the need for revascularization, was prepared for immediate action upon plaintiff's arrival. Because there was no overt indication that the tissues were dead, Dr. Smith believed there was still a chance to save the leg, even though there had been a four-hour delay since the intestinal surgery had been completed.
Dr. Smith testified that revascularization is almost always successful on a young healthy person when performed within four to six hours after the interruption of the blood supply, that the success rate diminishes as the time interval between disruption and revascularization increases, and that arteriosclerotic disease (as plaintiff had) lessens the chances for success. She further testified, based on her review of the records, that she would have performed the revascularization upon the completion of the intestinal surgery by closing the abdomen and doing an external by-pass from the left leg artery. If this procedure (which took Dr. Smith and her associate one hour and three minutes to perform) had been commenced shortly after 1:30 a.m. (when Dr. Wright completed the intestinal surgery), revascularization could have been completed shortly after 2:30 a.m., or about five to five and one-half hours after the shooting. This procedure, according to Dr. Smith, "would have significantly increased Mr. Graham's chances of having a successful salvage of his leg," as opposed to the procedure used by Dr. Wright that delayed the commencement of the revascularization efforts by more than four additional hours. Dr. Smith noted from first-hand observation that plaintiff "had a viable leg from the knee down at nine hours" after the shooting.
Dr. Kennan Beuchter, a general surgeon who specialized in trauma surgery and was then head of trauma surgery at LSUMC, performed the amputation after the unsuccessful revascularization attempt. He testified that a revascularization procedure on a young healthy person, if performed within six hours of the traumatic event, almost always results in a viable functional leg. After six hours, however, the success rate begins to decrease. Moreover, other factors, such as age and underlying arteriosclerosis, lessen the length of the "window of opportunity" for successful revascularization.
When it was pointed out to Dr. Beuchter on direct examination that the intestinal surgery was completed about 1:30 a.m. and *371 the vascular surgery did not begin until about 5:30 a.m., the doctor opined that the four-hour delay in commencing the revascularization procedure "contributed, orit may not have caused one-hundred percent, certainly contributed to the loss of that leg." However, on cross-examination, Dr. Beuchter, while maintaining that a six-hour window was not a "hard piece of data," conceded that quicker revascularization was needed according to the degree of arteriosclerosis in the injured person, because the limb is already "compromised." When informed that plaintiff, at the time of the injury, was sixty years old, had severe arteriosclerosis, chronic pulmonary disease, diabetes, hypertension, and a forty-year history of heavy smoking, and had suffered a stroke and a heart attack, the doctor assessed the chance of successful revascularization at sixty to seventy percent if competed within two to four hours after the trauma. In summary, the doctor attributed the failure to complete revascularization within six hours and the underlying vascular disease as substantial contributors to the failure of the by-pass procedure.
Dr. Lawrence Hiller, a vascular surgeon, testified at trial after reviewing plaintiff's medical records from the 1991 gunshot incident and from plaintiff's hospitalization in 1979 for vascular insufficiency. He stated the rule-of-thumb, derived from studies of injuries to young healthy soldiers, that revascularization of a limb is almost always successful if performed within six hours of the trauma. Based on plaintiff's medical history that included severe vascular insufficiency dating back to 1979, diabetes, and a long history of smoking, as well as his age, the doctor believed plaintiff's "window of opportunity" was only three to four hours, and that the chances of successful revascularization even during that period "wouldn't be one hundred percent," but would only be more probable than not.
Dr. Hiller conceded that the chance of revascularization success in the ordinary case decreased after six hours on a "sliding scale," but he could not commit to any estimated percentages of success when revascularization was performed after longer periods of time had elapsed. He averred that there would have been a greater chance of saving the leg if revascularization had begun at 1:30 a.m.[5] (when the abdomen was first closed), but again he declined to estimate percentages.
Dr. Hiller concluded that because there was not enough time and too much underlying vascular disease, plaintiff's leg more probably than not would have been lost even if revascularization had been done at Willis-Knighton immediately following the intestinal repair. He did state, however, that the "window of opportunity" for successful revascularization is "different for everybody."

IV
The present case illustrates the problems with the workability of the Pendleton procedure. The court of appeal in the present case, both before and after the Pendleton decision, concluded that the "original harm, liability for which was admitted in the settlement, was the loss of Graham's leg." 95-27,338 at 8; 662 So.2d at 166 (emphasis in original). Yet when the case was tried, the trial court placed the burden on plaintiff to prove causation of damages resulting from the admitted malpractice, and plaintiff produced no evidence to support a finding (had the trial judge made such a finding) that revascularization at Willis-Knighton immediately upon completion of the intestinal surgery, more probably than not, would have saved the leg from amputation.[6]
Under the evidence most favorable to plaintiff, revascularization had to be completed within three to four hours of the trauma for a person of plaintiff's age and arteriosclerotic condition to have a better-than-even (sixty to seventy percent) chance of success. Moreover, Dr. Hiller, the expert found most credible by the trial judge, expressed his opinion that because of plaintiff's age and *372 long-standing arteriosclerosis, revascularization at Willis-Knighton immediately following completion of the intestinal surgery at 1:30 a.m. (four hours after the shooting) more probably than not would have been unsuccessful.
If a Pendleton procedure had been undertaken on this evidence, the "original harm" could not have been the loss of the leg. On this record, the "original harm" under Pendleton was, at most, the loss of some chance of saving the leg from amputation.[7] The contrary conclusion by the court of appeal in this case points up two significant problems with the Pendleton procedure.
First, the Pendleton procedure in most cases is to be undertaken prior to trial on the basis of pleadings and discovery, and a ruling in favor of the plaintiff establishes an irrebuttable presumption of whatever the trial court on that limited evidence finds to be "original harm." On the other hand, if the trial judge allows a significant amount of evidence to be introduced at the Pendleton hearing, the procedure would be cumbersome and inefficient, and some type of pre-trial appellate review of the evidence establishing the irrebuttable presumption would be in order.
Second, the critical issuethe value of the loss of chanceshows additional difficulties in implementing the Pendleton original harm-secondary harm analysis in this type of case. Even if the tort victim is relieved of the burden of proving causation of the loss of chance, the victim certainly has the burden to prove the value of that loss. All of the evidence in this case from both sides, although not really introduced for that purpose, bears on the value of that loss.
Furthermore, many medical malpractice cases, especially those in which causation is truly at issue, involve the loss of a chance of survival or of a better chance of recovery. A Pendleton hearing prior to trial in such a case not only is inefficient, but it also does not relieve the medical malpractice victim of the burden of proving at trial (with much of the same causation evidence) the value of the loss of chance.
On reconsideration, we choose not to adhere to the Pendleton pre-trial procedure, but to refocus on which party has the burden of proving causation at trial. We now conclude that the legislative intent of "liability" in Section 1299.44 C(5) was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.

V
Irrespective of whether the plaintiff or the defendant had the burden of proof, the evidence in this case established that there was a chance of saving plaintiff's leg from amputation if Dr. Wright had fulfilled his duty to summon a vascular surgeon to perform the revascularization at Willis-Knighton upon completion (at 1:30 a.m.) of the intestinal repair. The only disagreement in the evidence was the extent of the lost chance.
Usually, this court would remand the case to the court of appeal to determine the amount of damages for this lost chance by according great deference to the trier-of-fact. However, the usual deference is not appropriate in the present case because the trier-of-fact (and especially the court of appeal) focused on the doctor's liability for the loss of the leg, rather than for the loss of the chance of saving the leg from amputation. Moreover, the case was tried in the trial court and in the court of appeal (prior to remand) before this court outlined the procedure for determining damages for the loss of a chance of survival in Smith v. State, Dept. of Health and Hosp., 95-0038 (La.6/25/96); 676 So.2d 543 (1996). Because the focus was primarily on whether the negligent delay more probably than not caused the loss of the leg, the trial court did not award any damages for the *373 loss of chance, and there is no award that is subject to review under the "much discretion" standard of La. Civ.Code art. 2324.1. Further, the award of the court of appeal (which was the first award of damages in a fixed amount in this case) was not for loss of chance, but was the total damages for loss of the leg.
This case has been remanded previously to the court of appeal, and that court has already determined the amount of damages that would be due if Dr. Wright's malpractice had caused the loss of plaintiff's leg. Since there is no complaint about that amount (if there was liability) and since there has already been one remand, we have decided to fix the damages for loss of chance on the record, rather than follow the usual procedure of remanding to the court of appeal.
If Dr. Wright had summoned a vascular surgeon timely, revascularization could have been completed within five to five and one-half hours of the shooting. Dr. Beuchter, a trauma surgeon with extensive experience, assessed the chances of successful revascularization for plaintiff, despite his underlying conditions, at sixty to seventy percent if completed within two to four hours after the trauma. Dr. Hiller, although believing that the leg more likely than not would have been lost even if revascularization had been performed as early as possible at Willis-Knighton, stated that the chance of success would have diminished on a sliding scale after the normal "window of opportunity" (which he estimated at two to four hours) passed.
When the chance of survival (or in this case of saving the leg from amputation) is less than fifty percent, the court may not award full damages for the loss of life (or loss of the leg). Smith v. State, Dept. of Health and Hosp., 95-0038 (La.6/25/96); 676 So.2d 543 (1996). Rather, the factfinder, judge or jury, focuses on the chance of survival (or the chance of saving the leg) that has been lost because of the malpractice and "value[s] the lost chance as a lump sum award based on all the evidence in the record, as in done for any other item of general damages." 95-0038 at 7; 676 So.2d at 547. The "loss of a less-than-even chance of survival [or chance of saving a limb] is a distinct injury compensable as general damages which cannot be calculated with mathematical certainty, ... [and] the factfinder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss." 95-0038 at 9; 676 So.2d at 548. "The jury's verdict of a lump sum amount of damages can be tested on appeal for support in the record by reviewing the percentage chances and the losses incurred by the tort victim and his or her heirs, and any other relevant evidence, thus providing assurance against speculative verdicts." 95-0038 at 11; 676 So.2d at 549.
Considering in the present case that an award of approximately $470,000 would have been reasonable for the loss of the leg, that plaintiff had a chance of saving his leg from amputation if revascularization had been performed promptly at Willis-Knighton and completed within five to five-and-one-half hours of the trauma, that the less-than-even chance on this record would have been within the range of perhaps twenty to thirty-three percent, and that plaintiff sustained other damages from the delay (as recognized by the trial court), this court fixes the overall damages at $140,000. This amount will be awarded, subject to a credit for the $100,000 previously paid in settlement.
For the foregoing reasons, the judgment of the court of appeal is amended to reduce the award of damages to $140,000, subject to a credit of $100,000, and is otherwise affirmed.
JOHNSON, J., not on panel. Rule IV, Part 2, § 3.
CALOGERO, C.J., dissents and assigns reasons.
CALOGERO, Chief Justice, dissenting.
In my view, the majority's interpretation of LSA-RS 40:1299.4(C)(5) renders the statutorily imposed admission of liability meaningless. The majority concludes that the phrase "the court shall consider the liability of the health care provider as admitted and established" in LSA-RS 40:1299.44(C)(5) means only that a "payment of $100,000 in settlement admits liability for the malpractice and *374 for damages of at least $100,000." Slip op. at 15. Thus, the majority concludes that in a subsequent suit against the PCF, the medical malpractice plaintiff would bear "the burden of proving that the admitted malpractice caused damages in excess of $100,000." Id.
The fallacy of the majority's interpretation becomes evident in the following hypotheticals. Assume that a medical malpractice plaintiff files suit against a qualified health care provider, alleging that the doctor's negligence caused the permanent loss of his eyesight. The plaintiff settles with the doctor's insurer for $99,000 and reserves his right to recover excess damages against the PCF. In this instance, the statutory admission of liability in LSA-RS 40:1299.44(C)(5) is not triggered. Therefore, when this plaintiff sues the PCF for all or a portion of the PCF's $400,000 exposure, the plaintiff must prove fault, causation, and damages. This is the result that the Legislature intended when it enacted the Medical Malpractice Act.
Assume, however, that this medical malpractice plaintiff settles with the doctor's insurer for $100,000 (his maximum exposure under the Medical Malpractice Act), that he reserves his right to recover excess damages against the PCF, and that this settlement is approved by the district court judge. In this instance, the statutory admission of liability found in LSA-RS 40:1299.44(C)(5) is triggered. The plaintiff, thus, is entitled to receive the benefit of the only propatient provision of the Medical Malpractice Actan Act which limits every claimant's general damages to $500,000 irrespective of the actual value of the claims. In my view, and under Pendleton, the statutory benefit found in LSA-RS 40:1299.44(C)(5) is that liability is established on the part of the PCF, thereby precluding the PCF from contesting fault or causation as to the primary harmthat is, the harm that prompted the settlement paymentwhere the plaintiff proceeds against the PCF in a suit for damages in excess of $100,000.
According to the majority, however, the statutory benefit is that malpractice and damages of "at least" $100,000 is admitted, but in a suit against the PCF for excess damages, the plaintiff must then prove "that the admitted malpractice caused damages in excess of $100,000." The majority characterizes its interpretation of LSA-RS 40:1299.44(C)(5) as providing a "very significant benefit to the medical malpractice victim." Slip op. at 15. This begs the question: Where is this "very significant" benefit of statutorily admitted liability to this hypothetical plaintiff who must now prove, in order to recover any additional damages from the PCF, that the doctor caused his blindness? In other words, what benefit to the plaintiff is an "admission" of malpractice if the plaintiff must nonetheless prove causation? In my view, the majority's interpretation of LSA-RS 40:1299.44(C)(5) provides absolutely no benefit to the medical malpractice plaintiff and, in fact, renders the only pro-patient benefit under the severe Medical Malpractice Act non-existent.
The proper interpretation of LSA-RS 40:1299.44(C)(5), as I explained when writing for the Court in Pendleton v. Barrett, 95-2066 (La.5/31/96), 675 So.2d 720, can only be ascertained by adhering to certain tenets of statutory interpretation:
First, ... the Medical Malpractice Act is to be strictly construed against limiting the tort claimant's rights against the wrongdoer. Second, the admission of liability clause in LSA-RS 40:1299.44(C)(5) was arguably enacted to offset in part the advantages to health care providers of the $500,000 damages cap. Third, settlements are favored in our law, so we should not discourage plaintiffs from settling medical malpractice cases by interpreting a statute so as to create a post-settlement burden of proof when another interpretation is reasonable. Fourth, a plaintiff does not have to prove what has been admitted.
Id. at 728-29 (emphasis added). With those tenets in mind, this Court in Pendleton held that "when a health care provider admits and establishes liability by payment of $100,000... under LSA-RS 40:1299.44(C)(5), claimant is relieved of the obligation to prove a causal connection between the admitted malpractice and claimant's original and primary harm. However, if claimant is asserting claims for secondary damages, then he has the burden ... to prove that this secondary *375 harm was caused by the medical negligence." Id. at 730.
This Pendleton approach was the result of the careful balancing of two competing interests: (1) If the plaintiff were required to prove the causal connection between excess damages and the admitted malpractice, then the statutory admission of liability under LSA-RS 40:1299.44(C)(5) is rendered meaningless, and (2) If the plaintiff were relieved of proving a causal connection regarding all medical consequences alleged with respect to the malpractice, then the statutory admission of liability might trigger PCF exposure for secondary or sequential medical conditions that are unrelated to the health care provider's negligent conduct. In Pendleton, we reached a middle ground that gave effect to the statutory admission of liability and that also protected the PCF from unnecessary exposure from any alleged secondary harm that may not be causally related to the medical negligence.
Under our Pendleton standard, our hypothetical plaintiff would not bear the burden of proving causation as to the loss of eyesight at all. Rather, because the loss of eyesight would be his primary harm from the medical malpractice, the plaintiff would only have to prove the value of his claim. Suppose, however, that our hypothetical plaintiff alleges damages for a broken hip, which he sustained because his blindness caused him to trip and fall. In that instance, the broken hip would constitute secondary harm, and plaintiff would bear the burden of proving both causation and damages.
Of course, the qualified health care provider and the PCF could avoid this statutory admission of liability with regard even to the original harm by settling for one dollar less than $100,000. Moreover, if a doctor's insurer were willing to settle for the full $100,000 exposure without regard for the PCF's additional exposure, it would still be within the district court judge's power to prevent the statutorily imposed admission of liability. To illustrate, LSA-RS 40:1299.44(C)(5) permits the district court judge to consider "relevant evidence to enable the court to determine whether or not the petition [for settlement] should be approved [even] if it is submitted on agreement without objections." LA.REV. STAT. ANN. 40:1299.44(C)(5) (West 1992). Thus, if the district court judge should find insufficient evidence of liability on the part of the doctor, he would simply desist from approving a settlement for the full $100,000 triggering amount.
In the instant case, the primary harm is the loss of the plaintiff's leg. Therefore, I would apply the Pendleton approach and require only that plaintiff establish the value of his claim for excess damages against the PCF. However, the majority, comprised of a newly constituted panel of the Court, finds it necessary to overrule Pendleton, just fifteen months after this Court issued that decision, thereby placing beleaguered medical malpractice plaintiffs in a position where they receive nothing in the Medical Malpractice Act, except, of course, a $500,000 cap on actually suffered general damages. Perhaps this Court's struggle in interpreting LSA-RS 40:1299.44(C)(5) will invite the Legislature to take another hard look at the statute.
For the reasons given above, I respectfully dissent.
NOTES
[1] Administration of the anesthesia began at 11:15 p.m.
[2] As to causation of damages beyond the original harm, the court noted that the tort victim has the burden of proving these elements of damages under the duty-risk analysis. Determining that the amputation of plaintiff's left foot (and two subsequent heart attacks) resulted from his underlying severe arteriosclerosis and not from Dr. Wright's negligence, the intermediate court held that the trial court correctly rejected these items of damages.
[3] The appellate court's peremptory ruling in granting the application for rehearing in part was not related to the issue presently before this court.
[4] The Fund essentially wanted to litigate the liability of the other two doctors in an attempt to reduce the Fund's exposure from $400,000 to $200,000.
[5] Dr. Hiller stated that the vascular surgeon on call at Willis-Knighton could have arrived at the hospital in about twenty minutes if summoned by Dr. Wright.
[6] Indeed, had the trial judge placed the burden of proving causation of the leg loss on the Fund, the evidence would have met that burden.
[7] All experts agreed that if the revascularization procedure (which took slightly over one hour) had been completed at Willis-Knighton between 2:30 and 3:00 a.m., there was some chance of saving the leg.