JjTHIBODEAUX, Judge.
In this medical malpractice case, Bobby and Debra Judalet, individually and on behalf of their minor child, D’on Renee Judalet, filed suit against Dr. John Kusala-vage, St. Patrick Hospital and St. Paul Fire and Marine Insurance Company (hereinafter “St. Paul”) for failing to exercise the standard of care in treating Ms. Judalet and their child. The Judalets allege that Dr. Kusalavage prematurely ruptured Ms. Judalet’s amniotic sac, thereby resulting in the premature birth of D’on, and D’on’s acquisition of a bacterial infection and permanent complications. Dr. Kusalavage and his insurer,. St. Paul, tendered $100,000 in settlement, the statutory limit.
The Louisiana Patients’ Compensation Fund now appeals a judgment on a motion for declaratory and/or summary judgment that determined that D’on was delivered prematurely, and that the Group B B.eta Streptococcal infection was causally related to the premature birth. General damages in the amount of $500,000, less a credit of $100,000 were awarded.
For the following reasons, we affirm. .
I.

ISSUES

We shall consider:
1., whether the trial court erred in determining that the statutory admission of liability included an admission that D’on Judalet was. premature; and,
2. whether the trial court erred in granting the summary judgment in favor of Bobby and Debra Judalet.
Jsi[1]-

FACTS

Debra Judalet was an expectant mother who had her first office visit with obstetrician, Dr. John Kusalavage on May 30, 1991. During that visit, she conveyed to the doctor that‘the date-of her last menstrual period was March 16, 1991. From that date, the doctor estimated her due date to be December 23, 1991. Ms. Judal-et’s next visit to Dr. Kusalavage was June 27th. A review of an ultrasound taken on June 20th revealed that the gestational age of the fetus was nine weeks; therefore, the estimated due date was January 20, 1992. July 25th and August 28, 1991 were the subsequent dates of Ms. Judalet’s appointments with Dr. Kusalavage. The fetus’ fundal height1 on August 28th was twenty-one centimeters. This height was different from both the estimated due date based on Ms. Judalet’s last menstrual peri *1130 od and on the June 20 th sonogram. On September 25'th, Ms. Judalet again'had an office visit with Dr. Kusalavage. The fun-dal height of the fetus at this time was twenty-six centimeters, which was consistent with the estimated due date based on the date of Ms. Judalet’s last period. The fundal height measurement on October 23rd was thirty-one centimeters. Another sonogram performed on October 29 th revealed a gestational age of twenty-seven weeks; therefore, the estimated due date was changed to January 28, 1992. Based upon the two ultrasounds, Dr. Kusalavage predicted January 20, 1992 to be Ms. Ju-dalet’s due date. Ms. Judalet’s next visit was on November 20, 1991. Dr. Kusala-vage indicated that the fundal height of thirty-six centimeters seemed large based on the sonograms. December 4; 1991 was Ms. Judalet’s final ^office visit. The fun-dal height was thirty-seven centimeters; however, she had a small amount of dilation.
On December 11,1991, Ms. Judalet went to St. Patrick Hospital’s emergency room with complaints of contractions. A sonogram was done, and it revealed an estimat-, ed gestational age of thirty-seven weeks. After her labor failed to progress, Ms. Judalet was released from the hospital.
On December 18, 1991, Ms. Judalet again experienced contractions and was admitted by Dr. Kusalavage. He proceeded to rupture the membranes and increase the contractions. After approximately twenty-one hours of labor, Ms. Judalet gave birth to D’on Renee, a five pound, four ounce baby girl. D’on subsequently developed respiratory distress and was transferred to Lake Charles Memorial Hospital. While at Memorial, D’on was diagnosed as having Strep and meningitis. D’on was transferred to Oschner Foundation Hospital in New Orleans on December 30, 1991 after a series of seizures, intracra-nial hemorrhage and renal failure. D’on was not discharged from Oschner until February 10,1992.
A medical review panel was instituted against Dr. Kusalavage and St. Patrick Hospital after the Judalets charged that the doctor improperly induced Ms. Judal-et’s labor at an imprudent time, that he failed to adequately monitor for the presence of bacterial infection and that he failed to properly monitor Ms. Judalet’s status. The Judalets furthered their claim by asserting that the respiratory distress suffered by D’on was caused by a combination of her prematurity and the Strep infection. On May 23,1994, the panel unanimously held that the Judalets. failed to prove that D’on was premature as opposed to simply small for her gestational age. The panel also concluded that whether an infant is premature, small for gestational Page, or full-term normal weight, he remains susceptible to an infection and the resulting complications as those experienced by D’on.
The Judalets filed the original petition on July 16, 1994. On June 21, 1995, an amended and supplemental petition for damages was filed, adding St. Paul Fire and Marine Insurance Company and the Medical Arts Group as defendants. After years of litigating this matter, Dr. Kusala-vage and his insurer, St. Paul, tendered $100,000 in settlement in November 1998.
The Judalets subsequently filed a Motion for Summary Judgment, arguing that there were no genuine issues of material fact regarding their argument that no one could dispute that D’on’s pbemature birth was the direct cause of her damages. A Motion for Declaratory Judgment, which was considered as a Motion in Limine, was filed by the Judalets and it addressed the extent of the statutory admission resulting from Dr. Kusalavage’s offering of the $100,000. The Patients’ Compensation Fund (PCF) opposed the Summary Judgment, contending that its expert was of the opinion that D’on was not born prematurely. The trial court judge denied the Judal-ets’ Motion for Summary Judgment.
The Judalets re-urged the Motion for Summary Judgment. After hearing argu *1131 ments, the trial court • determined that D’on’s prematurity was a component of the admission of liability and, as a result of that malpractice, D’on became infected with the Strep infection. The judgment was signed on October 8, 1999, awarding general damages in the amount of $500,-000, less a credit of $100,000, plus interest and costs, and finding D’on in need of future care.
The PCF has suspensively appealed the trial court’s granting of the Summary Judgment in favor of the Judalets.
JiH.
LAW AND DISCUSSION Statutory Admission of Liability
The PCF argues that the statutory admission of liability can not include an admission that the Strep infection and the resulting complications were caused by the statutorily admitted malpractice.. We disagree.
The Patient’s Compensation Fund of La. R.S. 40:1299.44(0(5) provides:
At the hearing the board, the claimant, and the insurer of the health care provider or the self-insured health care provider as the case may be, may introduce relevant evidence to enable the court to determine whether or. not the petition should be approved if it is submitted on agreement without objections. If the board, the insurer of the health care provider or the self-insured health care provider as the case may be, and the claimant cannot agree on the amount, if any, to be paid out of the patient’s compensation fund, then the court shall determine the amount of claimant’s damages, if any, in excess of the amount already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and render a finding and judgment accordingly. In approving a settlement or determining the amount, if any, to be paid from the patient’s compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
(Emphasis added).
Once a malpractice victim settles with a health care provider or. dts insurer for $100,000, the liability of the health care provider has been admitted or established. Id. Settlement for a health care provider’s maximum liability of $100,000 activates liability of the PCF and precludes it from contesting the health care provider’s liability. La.R.S. 40:1299.42(B)(3); Stuka v. Fleming, 561 So.2d 1371 (La.1990), cert. denied by Louisiana Patient’s Compensation Fund v. Stuka, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990). Thus, liability is admitted. Bijou v. Alton Oschner Med. Found., 95-3074 (La.9/5/96); 679 So.2d 893. Stuka held that a settlement terminates the issue of liability in relation to the PCF. The Stuka court stated, in pertinent part:
Payment by one health care provider of the maximum amount of his liability statutorily .establishes that the plaintiff is a victim of that health care provider’s malpractice. Once payment by one health care provider has triggered the statutory admission of liability, the Fund cannot contest that admission. The only issue between the victim and the Fund thereafter is the amount of damages sustained by the victim as a result of the admitted malpractice.
Stuka at 1374 (emphasis added).
McPherson v. Lake Area Med. Ctr., 99-977 (La.App. 3 Cir. 12/29/99); 755 So.2d 972, a recent case in which we reversed a partial summary judgment in favor of the plaintiffs, supports our position. We determined that “[t]he McPhersons need only prove that their causally connected damages exceeded $100,000.00 in value.” McPherson at 975. This was in *1132 response to the PCF’s contention that the McPhersons were required to again prove that the health care provider’s conduct constituted malpractice as an element of proof of damages. In that case, we unquestionably, concluded that the malpractice victim is not obligated to prove that the damages suffered by him were caused by the health care provider after liability has been admitted; he need only prove the extent of those damages. Thus, the Judal-ets are merely responsible for proving that the damages exceeded the statutory limit of $100,000, thereby making the PCF liable for the balance.
Appellants erroneously argue that reliance on Graham v. Willis-Knighton Med. Ctr., 97-0188 (La.9/9/97); 699 So.2d 365, is unfounded.
|7We find it pointless to compose an interminable exegesis of Graham. Graham simply initiated the principle that once a defendant’s liability is established, the plaintiff is not additionally obligated to prove causation. The only remaining issue for plaintiff to verify is the amount of damages sustained by the victim which was consequential to the defendant’s admitted malpractice. An elementary principle of tort provides that cause-in-fact is a part of the liability equation. The $100,000 settlement made by Dr. Kusala-vage to the Judalets alleviated their duty of “proving (1) the standard of care and (2) a breach by the health care provider.” McPherson (quoting Greer v. LAMMICO, 29,066, p. 8 (La.App. 2 Cir. 4/13/98); 712 So.2d 598, 602).
This court is not in favor of the PCF’s feeble contention that Dr. Kusalavage admitted only the artificial rupturing of the membranes, not that D’on’s permanent infirmities resulted from her premature birth. We find it difficult to rationalize this argument in light of the fact that it is not such a unique occurrence for babies to be born prematurely. Additionally, numerous babies are born without the Strep infection. It is extremely improbable that obstetricians, including Dr. Kusalavage, would pay $100,000 merely for the premature births of their patients’ babies in the absence of complications. This court can not conceivably imagine the gargantuan expense of such compensation.
“Events that follow other events are usually assumed to be causally connected. However, coincidence may not necessarily indicate causation.” Wall v. Progressive Barge Line Inc., 97-0665, 97-0666, 97-0667, 97-0668, p. 1 (La.App. 4 Cir. 10/29/97); 703 So.2d 681, 692 (Plotkin, J., concurring). The record is devoid of any evidence that D’on’s maladies were coincidental to her premature birth. We are therefore convinced that Dr. Kusalavage’s tendering of the $100,000 incorporated an | sadmission that there exists a relationship between D’on’s severe and permanent complications and her premature birth. Accordingly, we conclude that the Judalets were responsible for proving merely that Dr. Kusalavage’s admitted malpractice caused damages in excess of $100,000.
The PCF offered the testimonies of Doctors Jay Goldsmith and Harley G. Ginsberg, staff neonatologists at Ochsner Clinic in New Orleans. Our review of the record reveals that neither doctor addresses the question of whether prematurity increases risk of the Strep infection as did the Judalets’ experts. Doctors Stewart Landry, Carmela Tardo, Richard Coulon, D’on’s treating physicians, and Doctors Arun Pramanik and Jerome Klein agreed that harm resulted from D’on’s premature birth and the extensive medical problems suffered by her flow from the events of her birth. Dr. Goldsmith’s testimony focused exclusively on whether or not D’on was premature. However, the question of prematurity was conceded with Dr. Kusala-vage’s $100,000 payment.
1 At the onset, Dr. Ginsberg was incapable of rendering an opinion as to the gestational age of D’on. The doctor also unsuccessfully avoided questions of whether prematurity increases risks of Strep infection. He conceded that more babies born *1133 preterm have Group B Strep. The doctor also testified that it is more common to see respiratory distress in preterm infants.
We conclude that the testimonies of Doctors Goldsmith and Ginsberg offer no genuine issues of material fact on. either causation, which is admitted, or damages. The PCF has additionally failed to present any evidence to refute the devastating damages suffered by D’on Judalet.
The Judalets submitted the unrefuted affidavits of Doctors Landry and Tardo. The doctors opined that the medical, complications suffered by D’on including |^respiratory failure, Group B Beta. Strep Sepsis, intraventricular hemorrhages, seizure disorder, ventricular shunt surgeries, brain damage, global development delays and others, have resulted in life-long disabilities for D’on. D’on’s disabilities will affect her ability to work, to be educated, and will continually affect the normal activities of her daily life. Doctors Landry and Tardo concluded that D’on’s complications were more likely than not results of her premature birth.
Dr. Coulon’s testimony reveals that D’on developed hydrocephalus (a backup of spinal fluid in the head) shortly after her birth. He imparted that hydrocephalus is medically related to premature' birth; the relationship being hemorrhage, which is more common among premature infants. Dr. Coulon associated D’on’s brain damage to her respiratory distress. According to the doctor’s discussion of D’on’s motor skills, she is functioning roughly five months below her age. An assessment'of her mental or cognitive skills shows that D’on is seven to eight months below the normal child at her age. Dr. Coulon further asserted that D’on has suffered permanent brain damage. She can live a functional, but qualitatively limited, life because of the brain damage. D’on will have a learning disability, which will require special education, as well as physical and cognitive disabilities.
Dr. Pramanik - swore that D’on’s post-delivery complications, including respiratory failure, Group B Beta, Streptococcus Sepsis, intraventricular hemorrhages, seizure disorder, ventriculus shunt surgeries, brain damage, global development delays and other physical complications, are significantly related to her premature birth and the prolonged rupture of membranes (approximately twenty-one hours). Based on respected studies, Dr. Pramanik concluded that D’on had in excess of six times the risk of the complications for which she suffers as .Compared' to a full term, | ^appropriate weight for a gestational age child, without the presence of a prolonged rupture of membranes.
Dr. Klein agreed with Dr. Pramanik and associated the cause of D’on’s Group B Streptococcal Sepsis with her premature birth and the prolonged rupture of membranes by noting that there is a significant relationship between prematurity and .prolonged rupture of membranes ,and the types of complicátions suffered' by D’on. Dr. -Klein confirmed Dr. Pramanik’s finding that D’on had an increased risk of Group B Strep Sepsis as compared to a full term, appropriate weight for gestational age child, without the presence of a prolonged rupture of membranes. '
Based on the foregoing deposition testimonies and affidavits, we find there are no genuine issues of material facts on the issues of causation and damages flowing from the admitted malpractice.
IV.

CONCLUSION

Based on the foregoing reasons, we find that the trial court did not err in determining that there are no genuine issues of material facts regarding prematurity and causation of damages in excess of $100,000. Bobby and Debra Judalet,-individually and on behalf of their daughter, D’on Renee Judalet, are entitled to general damages in the amount of $500,000, less a credit of $100,000, plus interest and costs.
*1134 All costs of this appeal are assessed to the Patients’ Compensation Fund.
AFFIRMED.

. Fundal height is the distance from the sym-physis pubis of the mother to the fundus of the uterus. One centimeter of fundal height generally correlates with one week of gestational age. „ •