KNOLL, Justice.
This medical malpractice action presents the issue of whether the Patient’s Compensation Fund (PCF) can be bound by summary judgment rendered solely against a defendant physician in the underlying malpractice proceeding on the issue of causation. Plaintiffs, Majdi Khammash and his wife and children, filed the instant suit against various defendants, including Dr. Gray Barrow. After approving plaintiffs settlement with Dr. Barrow for the $100,000 Medical Malpractice Act (MMA) cap,[1] the District Court granted partial summary judgment, finding plaintiffs injuries were caused by the fault of Dr. Barrow. The case then proceeded to jury trial against the PCF for the remaining $400,000 MMA cap. The jury returned a verdict in the PCF’s favor, finding Dr. Barrow’s malpractice did not cause plaintiff damage. The Court of Appeal reversed, finding 12as a result of the partial summary judgment, the issue of causation was not properly before the jury, and remanded for a new trial on damages only. We granted these consolidated writs to address the extent, if any, the PCF is bound by the partial summary judgment on causation. Khammash v. Clark, 13-1564, 13-1736 (La.11/15/13), 125 So.3d 1096. For the following reasons, we find, in accordance with La.Rev.Stat. § 40:1299.44(C)(5)(a) and our holding in Graham v. Willis-Knighton Med. Ctr., 97-0188 (La.9/9/97), 699 So.2d 365, 372, the partial summary judgment against Dr. Barrow on the issue of causation is not binding on the PCF in plaintiffs claim for damages exceeding the $100,000 MMA cap. Further finding no manifest error in the jury’s factual findings on causation, we reverse the judgment of the Court of Appeal and reinstate the District Court’s judgment in its entirety.
FACTS
The facts underlying this litigation are essentially undisputed. On September 26, 2000, Majdi Khammash, while in the course and scope of his employment as a paramedic supervisor with Acadian Ambulance Service, injured his back. On October 3, 2000, he was treated by Dr. John E. Clark for this work-related injury. Dr. Clark diagnosed him with a soft disc protrusion in the right foramen at the L3-4 level and a large disc herniation in the right neural canal at the L4-5 level. Dr. Clark referred Mr. Khammash to physical therapy and, on October 31, 2000, released him to return to full duty work with no restrictions.
Almost three years later, on or about June 9, 2003, Mr. Khammash returned for treatment with Dr. Clark, reporting a return of his prior symptoms — recurrent lumbar pain — for a duration of approximately three weeks, not related to any recent event or injury. Dr. Clark performed a neurological exam, which was | ¡¡normal, but also ordered an MRI. His impression at that time was Mr. Kham-mash had a “fragile back” subject to a high risk of recurring pain.
Mr. Khammash returned to Dr. Clark on or about June 19, 2003, at which time he reported, in addition to the increase in pain, symptoms of pain radiation to his *250 right lower extremities. The MRI showed a L3^4 broad base disc bulge with encroachment of the right L3 nerve root in the foramen.[2] Again, Dr. Clark referred Mr. Khammash to physical therapy, which Mr. Khammash began on or about July 1, 2003.
On that date, the physical therapist placed Mr. Khammash in mechanical lumbar traction for twenty minutes. Mr. Khammash informed the therapist that, during the traction, he felt an immediate onset of pain in his back, radiating down to his right leg. Mr. Khammash returned for scheduled therapy two days later, on July 3, 2003, at which time he was again placed in mechanical lumbar traction, and again, he felt and reported the immediate onset of pain in his back and legs. Mr. Kham-mash testified, even though he was in pain, he was able to walk unassisted from his car to the physical therapy office, but after the traction treatment, his pain and weakness were so severe he had to be taken by wheelchair to his car.
On July 5, 2003, a Saturday, unable to withstand the increasing pain in his lower right back and leg, Mr. Khammash went to the emergency room of Our Lady of the Lake Regional Medical Center (ER). He was treated with pain and steroid medications and was released, with instructions to return to see Dr. Clark first thing Monday morning.
On Monday, July 7, 2003, Mr. Kham-mash reported to his regularly scheduled physical therapy appointment and immediately advised the therapist he Chad been to the ER due to the sudden increase in the severity of the pain and significant weakness in his right leg. As the therapist was examining him, his symptoms of pain and weakness were so severe she immediately transported him in a wheelchair to Dr. Clark’s office, located in the same building. Dr. Clark, however, was out of town, and Mr. Khammash was placed in a room and prepared for an epidural injection. Shortly thereafter, Dr. Barrow entered the room, introduced himself as Dr. Clark’s associate, and explained he was there to administer an epidural injection to alleviate Mr. Khammash’s pain. Dr. Barrow did not perform a physical examination of Mr. Khammash, either before or after administering the injection, nor did he consult with Mr. Khammash after the injection was administered.
On July 15, 2003, Mr. Khammash returned to Dr. Clark and reported an increase in the pain in his right extremities as well as the significant loss of use of his right leg. Dr. Clark re-performed a neurological exam, which this time was positive for “absent right deep tendon reflex.” Dr. Clark also ordered a nerve conduction study and an EMG, which revealed serious nerve impingement. Based on these findings, Dr. Clark diagnosed an active and acute right L-4 radiculopathy. He further testified he believed Mr. Khammash needed a spine surgical consult and his increasingly worsening symptoms presented a “time sensitive condition.”
However, due to miscommunications with Dr. Clark’s office staff, Mr. Kham-mash was not seen for a surgical consult until August 8, 2003. On that date, Dr. Paul Waguespaek, a neurosurgeon, diagnosed Mr. Khammash as having a herniated disc fragment on the L3^1 right side and recommended a discectomy, which he performed on August 20, 2003. At a post-op visit on September 5, 2003, Dr. Wag-uespack noted a significant improvement in Mr. Khammash’s pain symptoms, but only some improvement in the numbness *251 and weakness in the right |5leg. He referred Mr. Khammash to physical therapy in hopes of his regaining some strength in the leg. However, when Mr. Khammash returned on November 20, 2003, his right leg had a “severely weakened” quadricep muscle, and Dr. Waguespack noted a visible sixty percent atrophy in the right leg as compared to the left.
On January 23, 2004, Dr. Waguespack performed a myelogram and post myelo-gram CT scan on Mr. Khammash and determined Mr. Khammash had nothing “going on in his back that required any kind of surgery.” Then on March 8, 2004, Dr. Waguespack reported to Mr. Kham-mash there was, unfortunately, nothing more he could do medically for his symptoms or condition.
On June 30, 2004, Mr. Khammash, together with his wife, and on behalf of their three minor children, filed a petition seeking damages from several defendants for alleged medical malpractice in failing to properly diagnose and treat Mr. Kham-mash’s spinal injury.[3] Plaintiffs contended those acts of malpractice exacerbated Mr. Khammash’s initial injury and caused a needless and unnecessary delay during which his chances of making a full recovery were significantly diminished, leading to the permanent pain and weakness in Mr. Khammash’s back and legs.[4]
On September 11, 2007, the plaintiffs filed leave to file a fourth amending petition based on the opinion of the medical review panel, which had been reviewing the claims against Drs. Clark and Barrow and concluded while Dr. Clark |6had not, Dr. Barrow had deviated from the appropriate standard of care. Thus, plaintiffs amended their action to add Dr. Barrow as a named defendant, alleging he failed to have in place the proper procedures whereby he could obtain adequate histories with regard to the patients he was overseeing for Dr. Clark; he failed to actually conduct a physical exam on Mr. Khammash; he failed to review prior records of the plaintiff and to observe a significant exacerbation of plaintiffs symptoms; and he failed to perform a proper work-up and make a spinal surgical referral when he saw Mr. Khammash on July 7, 2003.
As litigation continued, most of the named defendants were dismissed. On August 18, 2009, the plaintiffs filed a motion for partial summary judgment, seeking a finding that Dr. Barrow’s fault caused Mr. Khammash’s injuries. In support of their motion, the plaintiffs attached the decision of the medical review panel, the most relevant portion of which provides:
It is the opinion of this medical review panel that there was a deviation from the appropriate standard of care by Gray Barrow, M.D.... According to the records it appears Dr. Barrow did not examine Mr. Khammash on July 7, 2003. It was reported to Dr. Barrow by Ms. *252 Wall [the physical therapist treating Mr. Khammash] that the patient was having increasing leg pain and weakness. An appropriate physical exam on July 7, 2003 might have prompted Dr. Barrow to perform further workup and make a spinal surgical referral at that time. It appears that the patient apparently had neurologic decline between the emergency room visit of July 5, 2003 and Dr. Clark’s visit on July 15, 2003. Retrospectively it appears a more aggressive approach should have been taken by the emergency room and by Dr. Barrow on July 7, 2003. Regrettably, a spinal surgeon opinion and further radiological workup such as a lumbar CT myelogram was not obtained at that time. The outcome may have been different as by July 15, 2003, the neuro-deficits were present.
The plaintiffs’ motion for partial summary judgment was set and heard on the same date as their supplemental petition seeking court approval of their settlement with Dr. Barrow and his insurer for $100,000 and allowing them to proceed for the additional $400,000 claimed in damages against the PCF.
|70n October 6, 2009, the District Court rendered judgment, approving the settlement pursuant to La.Rev.Stat. § 40:1299.44(0, and reserving plaintiffs’ remaining claims for damages against the PCF. That same day, the District Court also granted partial summary judgment in favor of the plaintiffs, finding: (1) Dr. Barrow “to be at fault with respect to the injuries to Majdi Khammash which are the subject of these proceeding”; (2) “the injuries complained of by Majdi Khammash ... were caused by the fault of [Dr. Barrow]”; (3) Majdi Khammash free of fault with respect to the injuries suffered by him; and (4) Dr. Barrow was precluded from raising the fault of any of the other named (since dismissed) defendants at the trial on the merits or including the fault of other parties in the jury verdict form. The next day, the PCF filed its Motion and Order to Enroll as Counsel of Record. At this time, Dr. Barrow, now replaced as a party by the PCF, was the only defendant for trial.[5]
The matter then proceeded to a jury trial beginning on September 27, 2011, and on September 30, 2011, the following verdict was returned by the jury:
1) Do you find that the breach of the standard of care by Dr. Gray Barrow caused Mr. Khammash to suffer damages? [To which the jury checked: NO]
As directed, the jury then skipped all other inquiries and dated and signed the verdict form. The District Court rendered judgment in accordance with the jury verdict, dismissing plaintiffs’ claims with prejudice.
*253 |8On plaintiffs appeal, the Court of Appeal, First Circuit, reversed and remanded this matter for a new trial against the PCF. Khammash v. Clark, 12 CA 0736 (LaApp. 1 Cir. 5/17/13), 2013 WL 2150711 (unpub). In so ruling, the appellate court focused upon the partial summary judgment, which established not only Dr. Barrow’s liability, but also causation of Mr. Khammash’s injuries. Giving proper effect to that judgment, it reasoned the District Court erred in allowing any testimony whatsoever concerning causation, as well as directing the jury and allowing inquiries in the jury verdict form to place the issue of the causation of plaintiffs damages before the jury. As the sole issue properly before the jury was the quantification, if any, of Mr. Khammash’s injury beyond $100,000, the appellate court reversed, vacated, and set aside the lower court’s judgment. Moreover, because the plaintiffs specifically sought a trial by jury and given Mr. Khammash’s injuries are complex and not subject to a clear-cut quantification, the appellate court remanded this matter for a new trial solely on the quantification of the damages suffered by Mr. Kham-mash, rather than conduct its own de novo review.
DISCUSSION
Both the plaintiffs and the PCF sought writs from this Court, raising the same legal question: to what extent, if any, is the PCF bound by the partial summary judgment finding Dr. Barrow caused the injuries to plaintiff?
On one hand, the plaintiffs contend Dr. Barrow’s settlement effectively operates as a stipulation of fault and causation of plaintiffs injuries, and therefore, the PCF is liable. Moreover, they reason the partial summary judgment against Dr. Barrow binds the PCF as res judicata and rely heavily upon our decision in Hanks v. Seale, 04-1485 (La.6/17/05), 904 So.2d 662, for the proposition that the partial summary judgment became final when the PCF failed to appeal it, thus precluding the PCF from contesting liability, which consists of a finding of both fault and |9causation. Consequently, they contend the jury should have never been queried about Dr. Barrow’s fault, and the PCF’s evidence geared to disputing fault/causation was admitted in error.
On the other hand, the PCF argues under the MMA the liability of a health care provider and the liability of the PCF are independent and the PCF is granted the right to conduct discovery, identify and retain expert witnesses, and prepare a defense, all of which the partial summary judgment would foreclose. The PCF even suggests part of the settlement included Dr. Barrow’s agreement not to oppose the summary judgment finding causation. In any event, the PCF posits, because the PCF was not and statutorily could not be a party defendant, it cannot be bound by the summary judgment against Dr. Barrow. We agree.
In 1975, the Legislature enacted the MMA, La.Rev.Stat. § 40:1299.41 et seq., to establish a framework for compensating persons who are injured as a result of medical malpractice committed by qualified health care providers. Bijou v. Alton Ochsner Med. Found., 95-3074, p. 4 (La.9/5/96), 679 So.2d 893, 896; Russo v. Vasquez, 94-2407, p. 5 (La.1/17/95), 648 So.2d 879, 882. The MMA limits the liability of a single qualified health care provider to $100,000 plus interest for all malpractice claims for injuries to or death of a patient. La.Rev.Stat. § 40:1299.42(B)(2). Any damages awarded or agreed to in excess of $100,000 may be recovered from the PCF; however, the total amount recoverable, exclusive of future medical care and related benefits, shall not exceed *254 $500,000 plus interest and cost. La.Rev. Stat. § 40:1299.42(B)(1) and (3).
In this framework, as this Court has previously stated, the MMA neither contemplates the PCF as a party defendant, nor gives the PCF status as a co-obligor or insurer of the health care provider. Williams v. Kushner, 449 So.2d 455, 458 (La.1984); see also Hanks, 04-1485 at p. 9, 904 So.2d at 667. Rather, the _J_igPCF is a statutory intervenor “who has an interest in the proceedings between the claimant and the health care provider because any damages in excess of one hundred thousand dollars are payable by the Fund.” Felix v. St Paul Fire and Marine Ins. Co., 477 So.2d 676, 680-81 (La.1985); see also, Hanks, 04-1485 at p. 9, 904 So.2d at 668; Williams, 449 So.2d at 458, n. 16.
The PCF’s status as an intervenor was triggered herein when the plaintiffs settled their claims for the $100,000 cap against Dr. Barrow and sought the remainder of the statutory cap from the PCF. The case then proceeded pursuant to the provisions of La.Rev.Stat. § 40:1299.44(0, which set forth the procedure when a claimant demands an amount in excess from the PCF after settlement with the health care provider:
If the insurer of a health care provider or a self-insured health care provider has agreed to settle its liability on a claim against its insured and claimant is demanding an amount in excess thereof from the patient’s compensation fund for a complete and final release, then the following procedure must be followed:
(1) A petition shall be filed by the claimant with the court in which the action is pending against the health care provider, if none is pending in the parish where plaintiff or defendant is domiciled seeking (a) approval of an agreed settlement, if any, and/or (b) demanding payment of damages from the patient’s compensation fund.
(2) A copy of the petition shall be served on the board, the health care provider and his insurer, at least ten days before filing and shall contain sufficient information to inform the other parties about the nature of the claim and the additional amount demanded.
(8) The board and the insurer of the health care provider or the self-insured health care provider as the case may be, may agree to a settlement with the claimant from the patient’s compensation fund, or the board and the insurer of the health care provider or the self-insured health care provider as the case may be, may file written objections to the payment of the amount demanded. The agreement or objections to the payment demanded shall be filed within twenty days after the petition is filed.
(4) As soon as practicable after the petition is filed in the court the judge shall fix the date on which the petition seeking approval of the agreed settlement and/or demanding payment of damages from the fund shall be heard, and shall notify the In claimant, the insurer of the health care provider or the self-insured health care provider as the case may be, and the board thereof as provided by law.
(5)(a) At the hearing the board, the claimant, and the insurer of the health care provider or the self-insured health care provider, as the case may be, may introduce relevant evidence to enable the court to determine whether or not the petition should be approved if it is submitted on agreement without objections. If the board, the insurer of the health care provider or *255 the self-insured health care provider, as the case may be, and the claimant cannot agree on the amount, if any, to be paid out of the patient’s compensation fund, then the trier of fact shall determine at a subsequent trial which shall take place only after the board shall have been given an adequate opportunity to conduct discovery, identify and retain expert witnesses, and prepare a defense, the amount of claimant’s damages, if any, in excess of the amount already paid by the insurer of the health care provider or self-insured health care provider. The trier of fact shall determine the amount for which the fund is liable and render a finding and judgment accordingly. The board shall have a right to request trial by jury whether or not a jury trial has been requested by the claimant or by any health care provider.
(e) In approving a settlement or determining the amount, if any, to be paid from the patient’s compensation fund, the trier of fact shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
La.Rev.Stat. § 40:1299.44(C)(emphasis added).
Once plaintiffs settled their dispute against the health care provider for the statutory cap of $100,000, liability for the malpractice and for damages of at least $100,000 was established. La.Rev.Stat. § 40:1299.44(C)(5)(e)(“In approving a settlement ..., the trier of fact shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars....”) However, as this Court stated in Graham, plaintiffs still had to prove the malpractice caused damages in excess of $100,000 at trial against the PCF under La.Rev.Stat. § 40:1299.44(C)(5)(a):
... We now conclude that the legislative intent of “liability” in Section 1299.44 C(5) was that the payment of $100,000 in settlement | ^establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.
Graham, 699 So.2d at 372.[6]
In Hall v. Brookshire Bros., Ltd., 02-2404 (La.6/27/03), 848 So.2d 559, we explained the rationale for this rule:
Liability implies some damage, but not specifically which damage or how much. Moolekamp v. Rubin, 531 So.2d 1124, 1126-1127 (La.App. 4 Cir.1988). Having proven that defendant’s fault caused damage, a plaintiff must further prove what damage, by kind and seriousness, was caused by defendant’s fault before the court can render an appropriate award. Id.
*256 A defendant is only liable for that damage caused by his or her fault. Fault is a broad concept, encompassing all conduct falling below a proper standard. Weiland v. King, 281 So.2d 688, 690 (La.1973), citing Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971).
When a defendant stipulates to liability, that defendant acknowledges that his or her fault (substandard performance of a legal duty owed to plaintiff for the protection from certain risks of harm) caused the plaintiff to sustain some damage (in the case of the qualified health care provider under the Medical Malpractice Act, that defendant stipulates that the damage he or she caused is at least $100,000).
However, there can be, and frequently is, more than one cause of a plaintiffs damages. Graves v. Page 96-2201 (La.11/7/97), 703 So.2d 566, 570; Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1179. Because a defendant is liable only for that damage caused by his or her fault, when a defendant stipulates to liability for fault, he or she does not thereby necessarily concede responsibility for 100% of the fault.
In the same vein, when a health care provider tenders payment of $100,000.00, thereby admitting and establishing “liability,” that admission of liability is an admission of fault and causation of damages of at least $100,000.00. It is not an admission of the percentage of fault attributable to the health care provider; nor is it an admission as to the extent of the claimant’s damages beyond $100,000.00. Louisiana Revised Statute 40:1299.44(0(5) speaks directly and exclusively to the liability of the health care provider; it is silent with respect to the responsibility of any other actor.
| mHall, 02-2404 at pp. 11-12, 848 So.2d at 567-68.
Clearly, when the PCF and claimant dispute the remaining amount due, the PCF is entitled to full discovery and a trial at which, under the statutory provisions and in accord with our jurisprudence, the claimant must prove his damages, if any, attributable to the malpractice in excess of the amount already paid by the defendant physician. Prior to the trial provided for in La.Rev.Stat. § 40:1299.44(C)(5)(a), only the liability of the defendant physician for the malpractice and damages up to $100,000 is conclusively established by the settlement in accordance with La.Rev.Stat. § 40:1299.44(C)(5)(e). See Gn-aham, 699 So.2d at 372. It follows, therefore, summary judgment as to his fault and causation, to which only the defendant physician and claimant were parties, can likewise only establish the liability of the defendant physician up to $100,000. The burden of proof for the remainder of the statutory cap remains on the claimant as explicitly contemplated by the above emphasized provisions of La.Rev.Stat. § 40:1299.44(C)(5)(a). Otherwise, the parties in the underlying proceeding could potentially negotiate the PCF’s liability as part and parcel of the settlement agreement, as alleged herein given Dr. Barrow’s agreement not to oppose the partial summary judgment on fault and causation, thus depriving the PCF of its statutorily granted right to “conduct discovery, identify and retain expert witnesses, and prepare a defense,” in conjunction with its ability to limit its exposure to excess damages at trial.
While we are mindful the MMA is in derogation of established rights and is to be strictly construed, Sewell v. Doctors Hosp., 600 So.2d 577, 578 (La.1992), we are nevertheless obligated to apply the Act in a manner which is consistent with logic *257 and the presumed fair purpose and intention of the Legislature in passing it. |14La. Civ.Code art. 10; Hall, 02-2404 at p. 13, 848 So.2d at 568. In this instance, our interpretation and application of the relevant statutory provisions is consistent with the Legislature’s clear intention to hold the PCF liable only for acts constituting medical malpractice. See La.Rev.Stat. § 40:1299.41(I)(cautioning “[n]othing in this Part shall be construed to make the [PCF] liable for any sums except for those arising from medical malpractice”); Hall, 02-2404 at pp. 13-14, 848 So.2d at 568. Similarly, it coincides with legislative intent in granting the PCF the ability to limit its liability by demonstrating, through full discovery and trial on the merits, the extent of damages, if any, occasioned by the malpractice at issue, all the while maintaining the “significant benefit” the plaintiff receives “in that the fault of the qualified health care provider is admitted as is causation of damages of at least $100,000.00 in value.” Hall, 02-2404 at p. 14, 848 So.2d at 568; Graham, 699 So.2d at 372. Therefore, in accordance with the above emphasized language of La.Rev. Stat. § 40:1299.44(0(5) and our holding in Graham as well as our reasoning in Hall, we find the partial summary judgment against Dr. Barrow on the issue of causation is not binding on the PCF in plaintiffs’ claim for damages exceeding the $100,000 MMA cap.
Contrary to plaintiffs’ argument, our position is further supported by the principles of res judicata set forth in La. Rev.Stat. § 13:4231, which provides:
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
| ]S(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
La.Rev.Stat. § 13:4231 (emphasis added). Under these provisions, a previous judgment can only preclude an issue against a party that actually participated in the litigation, and the PCF neither participated in nor was a party to this litigation until after the settlement, when it took the status of a statutory intervenor. See Hanks, 04-1485 at p. 9, 904 So.2d at 667; Williams, 449 So.2d at 458, n. 16. Plaintiffs also mistakenly rely on our opinion in Hanks, even though we expressly found therein:
In the instant case, nothing in the record indicates the existence of an agreement between the health care providers and the plaintiff to settle their liability in exchange for anything. This case simply does not involve a settlement liability. Rather, it involves a payment in satisfaction of an adverse judgment. Consequently, the provisions of La. R.S. 40:1299.44(0, including subsection (C)(5)(e), do not apply to this case.
Hanks, 04-1485 at p. 7, 904 So.2d at 666. Therefore, we find Hanks is clearly distin *258 guishable from the instant case and its holding is, likewise, inapplicable.
Accordingly, we reverse the judgment of the Court of Appeal finding the partial summary judgment binding on the PCF and now turn to the manifest error doctrine to review the jury’s factual conclusions on the issue of causation.

Manifest Error Review

In accordance with well-established law, much discretion is left to the judge or jury on determinations of fact. Guillory v. Lee, 09-0075, p. 14 (La.6/26/09) 16 So.3d 1104, 1116; Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74.
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel 11fithat its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Guillory, 09-0075 at p. 14, 16 So.3d at 1116-17 (quoting Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606). An appellate court, in reviewing a jury’s factual conclusions, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong. Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810; Guillory v. Insurance Co. of North America, 96-1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury’s fact-finding conclusion was a reasonable one. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).[7]
Notably, reasonable persons frequently disagree. Guillory, 09-0075 at pp. 15-16, 16 So.3d at 1117. However, where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. “[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Canter, 283 So.2d at 724. Simply stated,
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so |17heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But *259 where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell, 549 So.2d at 844-45 (citations omitted). With these principles in mind, we must review the record evidence and determine if the jury erred in its factual conclusions regarding causation.
To establish causation in a medical malpractice action, the plaintiffs bore the burden of proving “[t]hat as a proximate result of [Dr. Barrow’s] lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.” La.Rev.Stat. § 9:2794(A)(3). Moreover, while medical testimony is not always necessary, our long standing jurisprudence has held, “because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under La.Rev.Stat. § 9:2794’s requirements without medical experts.” Pfiffner v. Correa, 94-0992 (La.10/17/94), 643 So.2d 1228, 1234; see also Samaha v. Rau, 07-1726, pp. 5-6 (La.2/26/08), 977 So.2d 880, 883-84.
Following a three-day trial during which five physicians testified on the issue of causation, the jury concluded the plaintiff had not proven Dr. Barrow’s actions or inaction caused plaintiffs injuries. After careful review of the evidence, we cannot say the jury manifestly erred.
As the record shows, the majority of physicians who testified conceded that, even if surgery had been done two days before Dr. Barrow first saw Mr. Kham-mash, he “can’t claim that that would solve his weakness” and the damage to | ^plaintiffs nerve root most likely resulted from an acute disc herniation or extrusion that occurred during his physical therapy session. Dr. Waguespack, who performed the surgery to remove the disc fragments at the L3-4 level, was the first expert to testify. Although he admitted prolonged length of nerve impingement or pressure can cause the nerve fiber to die and in such cases he tends to want to treat early, he could not say “more probably than not” the outcome, ie., plaintiffs weakness, “would have been any different with a surgery done on July the 5th or August 20th.” He would, however, have “been willing to try.” Dr. Clark, Mr. Kham-mash’s treating physician, next testified as an expert in the field of physical medicine and rehabilitation. He opined Mr. Kham-mash’s acute herniation occurred on July 1 in physical therapy and was time sensitive, such that plaintiffs best chance at recovery was “if he had had the surgery the day of the event.” However, he could not say if plaintiff would have recovered or that more probably than not surgical intervention would have changed the outcome on July 1, even though he did agree plaintiff had a greater chance of recovery if surgery had been done sooner.
Dr. Robert Franklin, a member of the medical review panel, also testified as an expert in physical medicine and rehabilitation. He opined, if plaintiff had been referred for surgical consult on July 7, then “more likely than not” that would “have given him his best chance” as the earlier the insult to the nerve root is removed, the potential for improvement increases. But, he could not say “more probable than not that he would have recovered” or with any medical certainty that had the surgery occurred any sooner “the result would have been any different.”
The next expert witness to testify on causation was Dr. Louis Blanda, an orthopedic surgeon. He opined “the unkindly delay in relieving the nerve compression probably caused the nerve not to recover,” *260 and a surgical referral on 113July 7, 2008, would have made “the probability” of preventing permanent injury better. Dr. Bert Bratton, a neurosurgeon, was the last expert to testify on causation, and he presented three theories for plaintiffs present condition in the order of probability: (1) initial disc rupture was so traumatic it damaged the nerve at that point; (2) “significant delay to the ultimate decompression of the nerve”; or (3) still some compression of the L-4 nerve root at the adjacent L4-5 level. In his opinion, the damage to plaintiffs nerve root was such that the ultimate result was set by July 5, and he would not have performed surgery until the nerve decreased swelling of which the pain was indicative. Therefore, he concluded Dr. Ban*ow properly administered steroids to decrease the swelling, and there was no causal connection between his treatment or failure to perform a physical exam and plaintiffs current condition.
From this testimony, the jury could reasonably conclude: (1) plaintiffs injury was sustained during his physical therapy session; (2) the disc rupture at that time was so violent the nerve was permanently damaged; and (3) Dr. Barrow’s failure to examine and refer plaintiff for sui’gical consult on July 7 would not have resulted in any change in plaintiffs permanent condition. Therefore, the record evidence does reasonably show Dr. Barrow’s inaction did not cause plaintiffs injuries. Based on this evidence, the jury could reasonably conclude causation had not been proven. Thus, because the jury’s factual conclusions are reasonably supported by the record evidence, we must affirm the District Court’s ruling on the issue of causation.
CONCLUSION
In summary, we find the partial summary judgment on causation rendered against Dr. Barrow is not binding on the PCF in plaintiffs’ claim for damages exceeding $100,000. Reviewing the record in its entirety, we further find noj^manifest error in the jury’s factual conclusions on causation. Accordingly, we reversed the judgment of the Court of Appeal and reinstate the judgment of the District Court in its entirety.
DECREE
For these reasons, we reverse the judgment of the Court of Appeal and hereby reinstate the judgment of the District Court in its entirety.
REVERSED; JUDGMENT OF THE DISTRICT COURT REINSTATED.
CLARK, Justice, concurs in part, dissents in part for reasons to be assigned.
HUGHES, Justice, dissents with reasons.

. The MMA limits the liability of a single qualified health care provider to $100,000; any damages in excess of $100,000 may be recovered from the PCF, but may not exceed $500,000. Williamson v. Hospital Service Dist. No. 1 of Jefferson, 04-0451 (La. 12/1/04), 888 So.2d 782, 785-86.

. At that time, Dr. Clark noted the right L4-5 disc herniation and free disc fragment — Mr. Kliammash's previous 2000 injury — had largely resolved itself.

. Plaintiffs named as defendants: John E. Clark, M.D.; John E. Clark, M.D., Ltd., a professional medical organization; Louisiana Spine and Sports Medicine, L.L.C., the facility with which both Dr. Clark and Dr. Barrow were associated; Gloria Wall, the physical therapist who treated Mr. Khammash; Heather B. Landry, another physical therapist who treated Mr. Khammash; and MC2 Enterprises, L.L.C. operating as Capitol City Physical Therapy, and then J.E.C. Consultants, L.L.C. d/b/a Capitol City Physical Therapy, the facility with which both Wall and Landry were affiliated.

. The petition expressly noted, although some of the named defendants were qualified healthcare providers for whom claims first had to be reviewed by a medical review panel, other defendants were not such qualified providers, and the petition was filed against all out of an abundance of caution.

. On September 15, 2010, the plaintiffs filed another motion for summary judgment, asserting: (1) the only issue remaining was the extent of damages and (2) it would be an abuse of discretion to fail to award the full $500,000 allowable under MMA, subject to the $100,000 credit for Dr. Barrow and his insurer's settlement, given the lack of any genuine issue regarding Mr. Khammash’s injuries and disability. In October 2010, the plaintiffs also filed a Motion in Limine seeking to exclude the testimony of Dr. Bert R. Bratton, the PCF’s expert, intending to testify regarding causation and liability because the prior, unappealed partial summary judgment rendered those two issues final. Both of the foregoing motions were heard by the District Court on December 6, 2010, at which time the court denied both motions. On August 12, 2011, the plaintiffs filed a motion in li-mine to limit the jury verdict form and preclude causation as an issue. Plaintiffs also filed objections to the proposed jury charges pertaining to either liability or causation. Again, these motions were denied.

. Effective July 1, 2003, Act No. 882 of 2003 amended and reenacted La.Rev.Stat. § 40:1299.44(C)(5), moving the substance of the quoted provision from La.Rev.Stat. § 40:1299.44(0(5) to La.Rev.Stat. § 40:1299.44(C)(5)(e). Significantly, as Section 2 of Act 882 provides, the enactments of La.Rev.Stat. § 40:1299.44(C)(5)(a) and (e) were merely "procedural and interpretative in nature and ... intended to clarify and codify existing law.”

. This decision was superceded on other grounds by an amendment to La.Rev.Stat. § 23:1032 as recognized in Walls v. American Optical Corp., 98-0455, p. 3 (La.9/8/99), 740 So.2d 1262, 1265.