989 So.2d 809 (2008)
In re Medical Review Panel Proceedings for the Claim of Robert Donald FLOOD, Jr.
v.
PENDLETON MEMORIAL METHODIST HOSPITAL, et al.
No. 2008-CA-0096.
Court of Appeal of Louisiana, Fourth Circuit.
July 2, 2008.
*810 Richard C. Trahant and Ronald E. Lampard, Hand & Lampard, Metairie, LA, for Robert Donald Flood, Jr.
Ambrose K. Ramsey III, Suzanne F. LaNasa Curry & Friend New Orleans, LA, for Louisiana Patient's Compensation Fund/Louisiana Patient's Compensation Fund Oversight Board.
(Court composed of Judge DENNIS R. BAGNERIS, SR., Judge EDWIN A. LOMBARD, Judge Pro Tempore MOON LANDRIEU).
EDWIN A. LOMBARD, Judge.
In this medical malpractice suit, Defendant/Appellant, the Louisiana Patient's Compensation Fund / Louisiana Patient's Compensation Fund Oversight Board ("PCF"), appeals the judgment of the trial court awarding Plaintiff/Appellee, Robert Flood, Jr. ("Mr. Flood"), excess damages for physical and emotional injuries incurred *811 after he was negligently misdiagnosed with, and subsequently treated for, Stage IV terminal bone cancer. After a review of the record in light of the relevant law, we affirm the trial court's judgment in its entirety.

Relevant Facts
In 1999, Mr. Flood was being treated by a pulmonologist, Dr. Janine Parker ("Dr. Parker"), for emphysema at Pendleton Memorial Hospital in New Orleans, Louisiana. In December of 1999, a CT scan ordered by Dr. Parker revealed a nodule in Mr. Flood's left lung. Dr. Parker subsequently referred Mr. Flood to an oncologist, Dr. Ruben Vargas-Cuba ("Dr. Vargas"), for further evaluation.
After his initial consultation with Mr. Flood on January 20, 2000, Dr. Vargas ordered additional diagnostic testing including a nuclear bone scan, which was conducted at the direction of a radiologist named Dr. Lowell Hurwitz ("Dr. Hurwitz"). Dr. Hurwitz reviewed the film results and concluded that they indicated the presence of "osteoblastic lesions involving the scapulae, the ribs, vertebral bodies and pelvic bones." Based on this report, Dr. Vargas diagnosed Mr. Flood with Stage IV cancer and informed him that he likely had only months to live.
Dr. Vargas ordered Mr. Flood to undergo six aggressive courses of chemotherapy over the next five months, an order with which he complied, believing that it may prolong his life, if only for a short time. After the final chemotherapy treatment, Dr. Vargas ordered another nuclear bone scan, which was performed on June 19, 2000 by a radiologist, Dr. Michael Morin ("Dr. Morin"). Dr. Morin's impression after reading the scan was that the bony lesions previously seen on the original scan appeared to have mysteriously disappeared completely.
Later, Dr. Vargas asked Dr. Carl Merlin to review Mr. Flood's results. Almost immediately, Dr. Merlin realized that the bone scan which Drs. Vargas, Hurwitz, and Morin used to establish that Mr. Flood had Stage IV bone cancer had the name of a different patient on them. It was then discovered that the results of Mr. Flood's original January bone scan had been inadvertently switched with those of another patient and that it was this other patient, and not Mr. Flood, who had Stage IV bone cancer. Dr. Merlin also noted that every x-ray done since then apparently accepted the incorrect scans as Mr. Flood's. Moreover, the aggressive chemotherapy treatments ordered by Dr. Vargas had been based on the results of the wrong bone scan.
Dr. Vargas and Dr. Merlin met with Mr. Flood and acknowledged the mistake. They then set out to "cure" what the doctors now believed was Mr. Flood's Stage I lung cancer with even more chemotherapy as well as radiation treatments.
Mr. Flood filed suit against his treating physicians and their respective insurers alleging that he was misdiagnosed and that he received the wrong treatment and excessive chemotherapy, which caused him physical damages and mental pain and suffering. Before trial, Dr. Hurwitz settled with Mr. Flood for the $100,000 statutory limit. Dr. Vargas and Pendleton Memorial settled for a combined $45,000. The only remaining defendant at trial was PCF. The issue at trial was whether Mr. Flood was entitled to excess damages for his injuries above and beyond the $145,000 he had previously received in settlement. The trial court awarded Mr. Flood the statutory limit of $500,000, less the $145,000, for a total of $355,000. PCF appealed.

*812 Assignments of Error

On appeal, PCF argues that there was no reasonable basis for the trial court to find that the doctors' admitted negligence resulted in an overdose or excessive amount of chemotherapy, or that the chemotherapy caused Mr. Flood to sustain cardiac damage and worsening of his pre-existing emphysema. PCF also claims that there was no reasonable basis for the court to conclude that Mr. Flood sustained greatly compensable mental anguish as a result of the doctors' negligence in reading the wrong patient's bone scan results and subsequently diagnosing Mr. Flood with Stage IV lung cancer based upon his reading of the results without reviewing the actual scans. Finally, PCF argues that the trial court misapplied Louisiana law on quantum and that its award for mental anguish was too large under the circumstances.

Law & Discussion
The Medical Malpractice Act ("the Act"), adopted in 1975 in response to a perceived "crisis" in the delivery of health care arising from the burgeoning and increasingly prohibitive costs of medical malpractice insurance, seeks to further two competing goals: to ensure the availability of safe and affordable health care services to the public, and to simultaneously limit the potentially significant liability exposure of health care providers. Everett v. Goldman, 359 So.2d 1256, 1261 (La. 1978). In furtherance of these goals, the Act caps the total amount recoverable for all malpractice claims for injuries or death to a patient at $500,000, plus interest and costs, and limits a qualified health care provider's liability for the malpractice claims of any one patient to $100,000, plus interest. LSA-R.S. 40:1299.42(B)(1) and (2). In the event that a medical malpractice claimant settles with the qualified health care provider for the $100,000.00 limit of liability, the claimant may then demand any excess amounts owed him or her by virtue of a judgment or settlement (subject to the $500,000.00 cap) from PCF. LSA-R.S. 40:1299.42(C).
Section 1299.44(C) of the Act outlines the procedure for determining the amounts in excess of the settlement, if any, to be paid from the Fund. Section 1299.44(C)(5) provides in pertinent part:
In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
The Louisiana Supreme Court has been called upon to interpret Section 1299.44(C)(5) of the Act, and the particular provision "the court shall consider the liability of the health care provider as admitted and established," on several occasions. See, e.g., Pendleton v. Barrett, 95-2066 (La.5/31/96), 675 So.2d 720; Jones v. St. Francis Cabrini Hospital, 94-2217 (La.4/10/95), 652 So.2d 1331; Stuka v. Fleming, 561 So.2d 1371 (La.1990). Most recently, in Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365, the Supreme Court interpreted the quoted provision as follows:
We now conclude that the legislative intent of "liability" in Section 1299.44 C(5) was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving *813 that the admitted malpractice caused damages in excess of $100,000.
Graham, pp. 10-11, 699 So.2d at 372.
Thus, a settlement payment of $100,000 "constitutes an admission (1) of malpractice by the provider and (2) of causation by the malpractice of damages of at least $100,000." Pendleton v. Barrett, Id. Under this interpretation, the medical malpractice victim is relieved of proving (1) the standard of care and (2) a breach by the health care provider. However, the plaintiff, "just as the victim in any other tort action in which "liability" is admitted, has the burden of proving that the tortfeasor's admitted breach of the standard of care caused damages in excess of the amount paid in settlement." Graham v. Willis-Knighton Medical Center, 97-0188 at p. 6, 699 So.2d at 369.
Following the Graham rationale, Mr. Flood, the plaintiff in the instant case, had the burden of proving at trial that the admitted breach of the standard of care caused damages in excess of $145,000, the amount paid in settlement. Our question now is whether the trial court erred in finding that Mr. Flood met his burden of proving that PCF was liable to him for excess damages up to the statutory cap.
An appellate court may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840 (La.1989). The correct standard for appellate review of a damage award is clear abuse of discretion. Dawes v. Kinnett, 99-3157 to 99-3159 (La.App. 4 Cir. 1/17/01), 779 So.2d 978, 985, citing, Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La. 1993). That discretion is vast and should rarely be disturbed unless it is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances. Dawes, Id., citing, Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
At trial, Mr. Flood presented live testimony and medical records to support his contention that he suffered severe emotional damages, cardiac damage, and worsening of his pre-existing emphysema as a result of the settling doctor's medical malpractice.
Dr. Merlin testified at trial that, in retrospect, Mr. Flood received more chemotherapy than he needed. He opined that Mr. Flood would likely have been given two courses of chemotherapy if he had been properly diagnosed from the onset, and that the protocol for treating Stage I lung cancer is different from the protocol for treating Stage IV metastic bone cancer. He also testified that radiation, for example, was not a treatment option for Stage IV bone cancer.
PCF did not offer any live medical testimony to contradict Dr. Merlin's opinions. The only evidence PCF introduced in this regard was a brief stipulation read into the record that set forth that a Dr. Seiler, who had been retained as an expert by PCF, opined that Mr. Flood would have received the same treatment for Stage I lung cancer that he received for Stage IV bone cancer. The trial court obviously assigned more credibility to Dr. Merlin's live testimony than to Dr. Seiler's stipulation. We cannot say that the trial court erred in finding that there was ample evidence in the record to determine that Mr. Flood received too much chemotherapy under the circumstances.
*814 Mr. Flood also presented evidence at trial that he suffered damage to his heart as a result of the excessive and unnecessary chemotherapy treatments he received as a result of his misdiagnosis with Stage IV bone cancer. Dr. Vargas' medical records on Mr. Flood noted mild CHF (congestive heart failure) and his final office note of August 23, 2000 indicates a decrease in ejection fraction from 56 pre-treatment to 44 post-treatment and "with DOE that will be evaluated by cardiologist." Additionally, medical records from Dr. Ali Amkieh noted that at Mr. Flood's October 4, 2000 visit, an echocardiogram was conducted, which indicated significantly reduced left ventricular function with ejection fraction of 30% "that is probably secondary to chemotherapy."
In response, PCF argues that the damage to Mr. Flood's heart could have just as easily occurred with one dose of chemotherapy and, thus, his heart could still have been damaged if he had only been treated for Stage I cancer, which may have included chemotherapy. However, as Mr. Flood points out in his brief, there is no support for this statement in the record. PCF did not introduce any live testimony to contradict Mr. Flood's contention that the excessive chemotherapy caused a decrease in his heart function. On appeal, PCF attempts to offer deposition testimony of Dr. James Smith, who it did not call as a witness. However, since this testimony was not before the trial court, we cannot consider it on appeal. In light of the testimony contained in the record, we find that the trial court was reasonable in concluding that the excessive chemotherapy that Mr. Flood was forced to undergo caused damage to Mr. Flood's heart.
Mr. Flood also presented testimony that his emphysema, or COPD, was also worsened by the excessive chemotherapy. Medical records of Dr. Parker, Mr. Flood's pulmonologist, indicated that before the misdiagnosis, Mr. Flood's COPD had a good chance of "reversibility." However, medical records of Dr. Vargas show a marked decline in Mr. Flood's COPD condition during and after the completion of the chemotherapy courses. The records indicate that at his first visit with Dr. Vargas, on January 20, 2000, he felt like he could still work if he wanted to. By July of 2000, he was having more difficulty breathing and his cough had increased. By the end of the chemotherapy treatments, in August of 2000, Mr. Flood's condition had deteriorated to the point that he could hardly walk to the bathroom by himself.
In regard to emotional damages, Mr. Flood testified about how he felt after being told that he had Stage IV bone cancer and that he had only months to live. According to Mr. Flood, for five months he was all by himself just thinking he was going to die. Although Mr. Flood may have shown little emotion while testifying, he stated that during the time that he thought he was dying he began wrapping up his affairs and trying to make peace with his Maker. He also began drinking more heavily. Mr. Flood also described how his relationship with his sons suffered because he had no energy and had less interaction with them. He was unable to have any romantic relationships during that time, or since then.
PCF infers from Mr. Flood's failure to become hysterical upon being told that he was dying, failure to seek mental health treatment, and his somewhat stoic demeanor while testifying as to how he felt, that he was obviously not that affected by the news. This argument is not persuasive since all people react to things and show emotion differently. The fact that Mr. Flood did not become hysterical does *815 not mean that he was not devastated after being told that he had only months to live.
As previously stated, the trial court awarded Mr. Flood the statutory limit of $500,000, subject to a credit of $145,000, in damages for the physical injuries he incurred as a result of the misdiagnosis and excessive chemotherapy as well as the emotional distress caused by the malpractice. In its reasons for judgment, the trial court employs the cases David v. Our Lady of the Lake Hosp., Inc., 02-1945 (La.App. 1 Cir. 6/27/03), 857 So.2d 529 and Randall v. Chevron, U.S.A., Inc., 13 F.3d 888, 901-902 (5th Cir.1994), as guidelines for determining the amount of damages Mr. Flood should receive for his extreme emotional and permanent physical injuries. On appeal, PCF argues that the trial court erred in using the awards in Davis and Randall as a guideline for Mr. Flood's award, that it misapplied Louisiana law on quantum, and that its award for mental anguish was too large under the circumstances.
In David, supra, the First Circuit Court of Appeals awarded $632,000 for past and future mental pain and suffering and $895,000 for past and future emotional distress, including fear of cancer and loss of enjoyment of life, to a man who contracted Hepatitis C after a blood transfusion. The facts indicated that the plaintiff suffered from insomnia, that his relationships with his children had suffered, and he had not been able to engage in a romantic relationship since his diagnosis.
In Randall, supra, the United States Fifth Circuit Court of Appeal awarded $1,000,000 in a survival action to the family of a seaman based on the seaman's fear of looming death for twenty-five minutes before he drowned (which equated to $40,000 per minute of pain). The seaman had fallen overboard during an evacuation and drowned in the rough seas before he could be rescued.
In its brief, PCF argues that the trial court erred in ignoring the one published Louisiana decision reviewing a mental anguish award for an incorrect diagnosis of cancer, Rowsey v. Jones, 26-578 (La.App. 2 Cir. 5/10/95), 655 So.2d 560. In Rowsey, the family of a woman who had apparently been misdiagnosed with cancer brought suit for medical malpractice when their mother died of a heart attack and an autopsy indicated that she was cancer-free. The jury awarded $75,000 for the deceased patient's mental anguish for the physical and emotional injuries suffered as a result of her misdiagnosis and subsequent chemotherapy. The court noted, however, that the deceased patient suffered no permanent physical injuries as a result of the chemotherapy.
Although PCF is correct that there are no cases other than Rowsey, involving a misdiagnosis of cancer similar to the one in this case, awards from other jurisdictions are helpful in determining whether the award in the instant case was reasonable.
In Dougherty v. Gifford, 826 S.W.2d 668 (Tex. Ct.App. Texarkana 1992), for example, the appeals court of Texarkana, Texas, lowered the trial court's award of $1,000,000 to $300,000 to a man who received six weeks of chemotherapy and radiation treatments after being negligently misdiagnosed with malignant cancer of the esophagus. There, however, the plaintiff did not suffer from any permanent physical injuries as a result of the unnecessary chemotherapy.
In Blanchfield v. Dennis, 292 Md. 319, 438 A.2d 1330 (1982), the court of appeals of Maryland awarded $400,000 to a woman who was misdiagnosed with terminal bone cancer and was told that she had one month to a year to live. There, the plaintiff underwent only one session of chemotherapy *816 before she requested a second opinion that confirmed that she did not, in fact, have cancer. There, the plaintiff had suffered only the minor side-effects normally associated with chemotherapy.
In the case at hand, Mr. Flood was told he had months to live. In addition to the mental anguish he surely suffered as a result of this devastating news, he also suffers from heart problems and worsened COPD that his doctors attribute to the aggressive chemotherapy treatments he received for the Stage IV lung cancer that he did not have. Unlike the patients in the above cited cases, Mr. Flood suffered permanent physical injuries from the treatments, above and beyond the tiredness and weakness normally associated with chemotherapy. In light of the fact that Mr. Flood suffered great emotional distress, fear of impending death and loss of enjoyment of life PLUS a decrease in heart function, and the worsening of his pre-existing COPD, we cannot say that the trial court's award is excessive under the circumstances.
For the foregoing reasons, we affirm the judgment of the trial court awarding Mr. Flood the statutory limit of $500,000 plus legal interest and costs, less the $145,000 Mr. Flood previously received in settlement. All costs of this appeal are assessed to PCF.
AFFIRMED.