SANDRA CABRINA JENKINS, JUDGE
| ]This is a medical malpractice case arising out of a physician’s failure to diagnose and treat bacterial meningitis in a 25-day-old infant brought to the emergency room more than 20 years ago. Appellant Dichelle Williams, the infant’s mother, settled with the physician’s employer and its liability insurer for $100,001.00, and then sued ap-pellees, the Louisiana Patient’s Compensation Fund and the Louisiana Patient’s Compensation Fund Oversight Board (collectively, the “PCF”), for damages in excess of the settlement amount. The issue presented is whether the trial court erred in granting the PCF’s Motion for Summary Judgment. Finding that genuine issues of material fact exist that preclude the granting of summary judgment, we reverse and remand for- further proceedings.
APPELLATE JURISDICTION
Before we proceed with the explanation of our holding, we address a procedural matter concerning the lack of decretal language in the judgment granting the PCF’s Motion for Summary Judgment.
We cannot determine .the merits of an appeal unless our jurisdiction is properly invoked by a final judgment. Tomlinson v. Landmark Am. Ins. Co., 15-0276, p. 2 (La.App. 4 Cir. 3/23/16), 192 So.3d 153, 156. “A judgment is the ^determination of the rights of the parties in an action, and may award relief to which the parties are entitled.” La. Code Civ. P. art. 1841. A valid judgment must be precise, definite and certain. The quality of definiteness is essential to a proper judgment. Tomlinson, 15-0276, p. 2, 192 So.3d at 156.
A final judgment shall be identified as such by appropriate language. La. Code Civ. P. art. 1918. “A final appealable judgment must contain decretal language that names the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied.” Tomlinson, 15-0276, p. 2, 192 So.3d at 156 (citing Bd. of Supervisors of La. State Univ. v. Mid-City Holdings, L.L.C., 14-0506, p. 2 (La.App. 4 Cir. 10/15/14), 151 So.3d 908, 910). “ ‘The specific relief granted should be determinable from the judgment without reference to an extrinsic source such as pleadings or reasons for judgment.’ ” Id.
*423 The judgment which Dichelle Williams wishes to appeal merely provides, “It is ordered, adjudged and decreed that the Motion for Summary Judgment filed herein on behalf of Defendant, PCF is granted.” The judgment does- not decree the dismissal of Ms. Williams’s lawsuit with prejudice. Because the judgment from which Ms. Williams appealed is ‘“lacking in definitive decretal language necessary for the exercise of our appellate jurisdiction, the appellant is not entitled as of right to appellate review, but may nonetheless invoke our supervisory jurisdiction, which is discretionary with us to grant.’ ” Tomlinson, 15-0276, pp. 2-3, 192 So.3d at 156-57 (quoting Bd. of Supervisors, 14-0506 at p. 3, 151 So.3d at 910); La. Code Civ. P. art. 2201.
This court has converted appeals of non-appealable interlocutory judgments to applications for supervisory writs in cases where the appeals were filed within | athe 30-day period allowed for the filing of applications for supervisory review. Barham, Warner & Bellamy, L.L.C. v. Strategic Alliance Partners, L.L.C., 09-1528, p. 4 (La.App. 4 Cir. 5/26/10), 40 So.3d 1149, 1152. In this matter, Ms. Williams’s petition/motion for devolutive appeal was filed within 30 days of the September 10, 2015 judgment denying Ms. Williams’s Motion for New Trial. Accordingly, we will convert the appeal of the judgment to an application for supervisory writs, and consider it under our supervisory jurisdiction.
We now turn to the merits of the substantive issues before us.
FACTS AND PROCEDURAL HISTORY
On the evening of July 3, 1995, 25-day-old Dan’esia[1] Williams,was taken to the emergency room at Meadowcrest Hospital in Gretna, Louisiana, where she was seen by emergency room physician Dr. Thomas Louisville, an employee of EMSA Louisiana, Inc. (“EMSA”). Dr. Louisville ordered a chest x-ray, gave Dan’esia Tylenol for her fever, and discharged her with a diagnosis of “mild constipation.” The next afternoon, on July 4, 1995, Dan’esia was taken to the emergency room at Children’s Hospital in New Orleans, where she was diagnosed with Beta streptococcus bacterial meningitis and was hospitalized until July 18,1995.
On July 23, 1995, Dan’esia was again admitted to the emergency room at Children’s Hospital with seizures, a fever, and a “suspected recurrence” of bacterial meningitis. Dan’esia was given intravenous antibiotics, prescribed Phenobarbital for her seizures, and was discharged on July 26, 1995. .
|4On May 30, 1996, Dan’esia was again admitted to the emergency room at Children’s Hospital with seizures and a fever while she was being weaned off of Phenobarbital.
Thereafter, Dan’esia’s mother, Dichelle Williams, as tutrix for Dan’esia, filed a Medical Review Panel complaint against several healthcare providers, including EMSA. While the panel complaint was pending, EMSA and its professional liability insurer, AIG, agreed to settle for $100,001.00. On September 4, 2002, Ms. Williams filed a Petition for Approval of Agreed Settlement and Demand, naming the PCF as a defendant. On February 28, 2003, the trial court signed a judgment approving the settlement, and reserving Ms. Williams’s rights against PCF.
*424 In January 2003, Ms. Williams filed a First Amending and Supplementing Petition seeking damages from the PCF in excess of the amount received from EMSA and its insurer. The PCF answered the amending petition asserting, inter alia, that “plaintiffs claims [had] been sufficiently satisfied through their settlement with EMSA and its insurer, AIG, for a total of $100,001.00, and that plaintiffs [were] not entitled to an excess from the [PCF].”
Litigation and formal discovery proceeded through early 2006. On January 25, 2011, the PCF obtained an ex parte order of dismissal based on abandonment. Ms. Williams filed a Motion to Vacate the Order of Dismissal, which the trial court denied. In an unpublished opinion, this court reversed the trial court’s order of dismissal, and remanded the matter. In Re: Medical Review Panel of Dichelle Williams, Tutrix for Dan’esia Williams v. EMSA La., Inc., 11-1579 (La.App. 4 Cir. 5/23/12), 90 So.3d 563 (unpub.), writ denied, 12-1313 (La. 9/28/12), 98 So.3d 843.
|fiOn November 15, 2013, the trial court ordered Ms. Williams to provide an expert report from each witness from whom she would or might solicit expert testimony. Msi Williams submitted expert reports from Dr. Marc Zimmerman, a psychologist, and Dr. Charles Herring, a chiropractor. In response to the PCF’s interrogatories, Ms. Williams also identified Dr. Larry Lutwick as a may call expert witness in the area of infectious diseases.
On July 24, 2014, the PCF filed a Motion for Summary Judgment, arguing that Ms. Williams could not satisfy her evidentiary burden of proving that the acts or omissions of the settling defendants caused any injury to Dan’esia that would not otherwise have occurred. Ms. Williams filed a timely memorandum in opposition to the PCF’s Motion for Summary Judgment, in which she submitted the affidavits and expert reports of Drs. Zimmerman and Herring, as well as the affidavit of Dr. Larry Lutwick.
The PCF’s Motion for Summary Judgment was heard on September 12, 2014, and the matter was taken under advisement. On December 15, 2014 the trial court signed a judgment granting the PCF’s Motion for Summary Judgment. On March 26, 2015, the trial court issued its Reasons for Judgment.[2]
On December 23, 2014, Ms. Williams filed a Motion for New Trial on the PCF’s Motion for Summary Judgment. On February 26, 2015, the PCF filed a Motion to Strike the Affidavit of Dr. Larry Lutwick, which was attached to Ms. Williams’s opposition to the PCF’s Motion for Summary Judgment.
On September 10, 2015, the trial court signed a judgment denying Ms. Williams’s Motion for New Trial and denying the PCF’s Motion to Strike. On |fiSeptember 10, 2015, the trial court also issued written reasons for judgment. Ms. Williams timely appealed. The PCF filed an Answer to Appeal.
DISCUSSION
The PCF’s Answer to Appeal
The PCF seeks review of the trial court’s denial of its Motion to Strike the Affidavit of Dr. Larry Lutwick (“Lutwick Affidavit”). In its Motion to Strike, the PCF argued that the Lutwick Affidavit, which was filed on September 4, 2014 as an exhibit to Ms. Williams’s timely filed *425 memorandum in opposition to the PCF’s Motion for Summary Judgment, could not possibly be an original because it was signed by Dr. Lutwick and notarized on September 4, 2014 in Kalamazoo, Michigan.
Ms. Williams conceded that the original Lutwick Affidavit was not filed in the record, but remedied the error by filing a supplemental affidavit. In Ms. Williams’s memorandum in opposition to the PCF’s Motion to Strike, she attached an original “Attestation Affidavit” by Dr. Lutwick, in which he stated that he was unable to locate the original affidavit that he signed before a notary public on September 4, 2014. Dr. Lutwick attested that the September 4, 2014 Affidavit that was filed in the record is a true copy of his original Affidavit that was lost.
We review the trial court’s ruling on a motion to strike under an abuse of discretion standard. Madison v. Inter-Continental Hotels Corp., 14-0717, p. 8 (La.App. 4 Cir. 8/26/15), 173 So.3d 1246, 1251, writ denied, 15-1757 (La. 11/6/15), 180 So.3d 310. Under La. Code Evid. art. 1003, a duplicate is admissible to the same extent as an original unless: (1) a genuine question is raised as to the authenticity of the original; (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original; or (3) the original is a testament offered for | 7probate, a contract on which the claim or defense is based, or is otherwise closely related to a controlling issue. None of the three exceptions apply here. Because the Lutwick Affidavit otherwise satisfies the requirements of La. Code Civ. P. art. 967(A), and the PCF has not shown that it was prejudiced by the filing of a copy of the Lutwick Affidavit instead of the original Affidavit, we find the trial court did not abuse its discretion in denying the PCF’s Motion to Strike.
Standard of Review: Motion for Summary Judgment
Appellate courts review summary judgments under the de novo standard of review, using the same standard applied by the trial court in deciding the motion for summary judgment; as a result, we are not required tó analyze the facts and evidence with deference to the judgment of the trial court or its reasons for judgment. Orleans Parish Sch. Bd. v. Lexington Ins. Co., 12-0095, p. 5 (La.App. 4 Cir. 8/28/13), 123 So.3d 787, 790. Although a trial court’s reasoning for granting a summary judgment may well be informative, it is not determinative of the legal issues to be resolved by the appellate court. Id. “We therefore look at the record before us and make an- independent determination regarding whether there are genuine issues of material fact that would preclude granting summary judgment.” Id.
Burden of Proof: Motion for Summary Judgment
“[I]n reviewing summary judgments, we remain mindful of which party bears the burden of proof.” Orleans Parish Sch. Bd., 12-0095 at p. 6, 123 So.3d at 790. “Although the burden of proof on a motion for summary judgment remains with the moving party, the mover’s burden changes depending upon whether he or she will bear the burden of proof at trial on the matter that is the subject of the motion for summary judgment.” Id. at p. 6, 123 So.3d at 790-9L
|s“[I]f the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary-judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence’ of factual support for one or more elements essential to the adverse party’s *426 claim, action, or defense.” La. Code Civ. P. art. 966(C)(2) (prior to amendment by 2016 Acts, No. 422, effective January 1, 2016). Article 966(C)(2) further provides that “if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.” La. Code Civ. P. art. 966(C)(2) (prior to amendment by 2015 Acts, No. 422, effective January 1, 2016).
For purposes of a motion for summary judgment, a “genuine issue” is a “triable issue.” Bd. of Comm’rs of Port of New Orleans v. City of New Orleans, 13-0881, p. 6 (La.App. 4 Cir. 2/26/14), 135 So.3d 821, 825. “If reasonable persons could disagree after considering , the evidence, a genuine issue exists.” Id. If, however, reasonable persons could reach only one conclusion on the state of the evidence, there is no need for a trial on that issue and summary judgment is appropriate. Id. “In determining whether an issue is ‘genuine,’ courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence.” Id. (quoting Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 731).
Assignment of Error No. 1:
Existence of Genuine Issues of Material Fact as to Causation and Damages
The Medical Malpractice Act, La. R.S. 40:1231.1, et seq. (“MMA”), establishes a framework for compensating persons who are injured as a result of hmedical malpractice committed by qualified health care providers. Khammash v. Clark, 13-1564, 13-1736, p. 9 (La. 5/7/14), 145 So.3d 246, 253. The MMA limits the liability of a single qualified health care provider to $100,000.00 plus interest for all malpractice claims for injuries to or death of a patient. Id.; La. R.S. 40:1231.2(B)(2). “Any damages awarded or agreed to in excess of $100,000 may be recovered from the PCF; however, the total amount recoverable, exclusive of future medical care and related benefits, shall not exceed $500,000 plus interest and costs.” Khammash, 13-1564 at p. 9,145 So.3d at 253-54; La. R.S. 40:1231.2(B)(1), (3).
Under this framework, the MMA does not give the PCF the status as a party defendant, or as a co-obligor or insurer of the health care provider. Khammash, 13-1564 at p. 9, 145 So.3d at 254. “ ‘[R]ather, the PCF is a statutory interve-nor who has an interest in the proceedings between the claimant and the health care provider because any damages in excess of one hundred thousand dollars are payable by the [PCF],’ ” Id., 13-1564 at pp. 9-10, 145 So.3d at 254 (quoting Felix v. St. Paul Fire & Marine Ins. Co., 477 So.2d 676, 680-81 (La. 1985)). The PCF’s status as intervenor is triggered when the claimant settles her claims against the healthcare provider and its insurer for the $100,000,00 cap, and seeks the remainder of' the $500,000.00 statutory cap from the PCF. Id.
La. R.S. 40:1231.4(C) outlines the procedure for determining the amounts in excess of the settlement, if any, that are to be paid by the PCF. Section 1231.4(C)(5)(e) provides, in pertinent part:
In approving a settlement or determining the amount, if any, to be paid from the patient’s compensation fund, the trier of fact shall consider the liability of the health care provider as admitted and established where the insurer has paid. its policy limits of one hundred | mthousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars. [Emphasis added]
The Supreme Court has been called upon to interpret the particular phrase: “shall consider the liability 'of the health *427 care provider as admitted and established.” In Graham v, Willis-Knighton Med. Ctr., 97-0188 (La. 9/9/97), 699 So.2d 365, the Court interpreted the quoted provision as follows:.
We now conclude that the legislative intent of “liability” in Section 1299.44C(5) [now Section 1231.4(C)(5)] [3] was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.
Id., 97-0188 at p. 15, 699 So.2d at 372 (emphasis added).
Thus, the legislature intended the word “liability” in Section 1231.4(C)(5) to have the same meaning in the context of medical malpractice litigation as it does in any other tort case in which “liability” is admitted. See Hall v. Brookshire Bros., Ltd., 02-2404, 02-2421, p. 11 (La. 6/27/03), 848 So.2d 559, 566-67. When a health care provider tenders payment of $100,000.00, thereby admitting and establishing liability, “that admission of liability is an admission of fault and causation of damages of at least $100,000.” Id., 02-2404 at p. 12, 848 So.2d at 567. It is not, however, an admission as to the extent of the claimant’s damages beyond $100,000.00. Id.
La. R.S. 40:1231.4(0(5) governs the trial procedure for petitions filed by claimants against the PCF. If the PCF and the claimant cannot agree on the amount, if any, to be paid out of the patient’s compensation fund, then:
ln[T]he trier of fact shall determine at a subsequent trial which shall take place only after the [PCF] board shall have been given an adequate opportunity , to conduct discovery, identify and retain expert witnesses, and prepare a defense, the amount of claimant’s damages, if any, in excess of the amount already paid by the insurer. ... The trier of fact shall determine the amount for which the fund is liable and render a finding and judgment accordingly. The board shall have a right to request a trial by jury whether or not a jury trial has been requested by the claimant or by any health care provider.
La. R.S. 40:1231.4(C)(5)(a).
Elements of Medical Malpractice Claim and Burden of Proof
In general, a claimant under the MMA has the burden of proving by a preponderance of the evidence: (1) the standard of care; (2) the breach of the standard of care; and (3) that the substandard care caused an injury that the plaintiff otherwise would not have suffered. Gaffney v. Giles, 14-0384, p. 10 (La. App. 4 Cir. 4/29/15), 165 So.3d 1100, 1107; La. R.S; 9:2794(A). “Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not.” Joseph v. Williams, 12-0675, p. 23 (La.App. 4 Cir. 11/14/12), 105 So.3d 207, 222 (quoting Hanks v. Entergy Corp., 06-477, p. 19 (La. 12/18/06), 944 So.2d 564, 578).
In this action against the PCF, the first and second elements of liability are deemed admitted and established. See Bijou v. Alton Ochsner Med. Found., 95-3074, p. 5 (La. 9/5/96), 679 So.2d 893, 896. Because the PCF cannot contest the issue of fault (standard of care and' breach *428 thereof), Ms. Williams need only prove by a preponderance of the evidence that the admitted malpractice caused damages (in excess of $100,000.00) that she would not otherwise have suffered. See Flood v. Pendleton Mem. Methodist Hosp., 08-0096, p. 6 (La.App. 4 Cir. 7/2/08), 989 So.2d 809, 813; La. R.S. 9:2794(A).
112Here, the PCF will not bear the burden of proof at trial. Thus, the PCF’s burden on its Motion for Summary Judgment does not require it to negate all essential elements of Ms. Williams’s claim, but rather to point out to the court that there is an absence of factual support for one or more elements essential to her claim. If Ms. Williams then fails to produce evidence sufficient to show that she will be able to satisfy her burden of proof at trial, there is no genuine issue of material fact, and the PCF is entitled to summary judgment as a matter of law.
The PCF argues that it has established the absence of factual support for Dan’esia’s claim that she sustained damages in excess of $100,000.00 that she otherwise would not have sustained, so that she will be unable to satisfy her burden of proof at trial on this issue.
In its written reasons for granting the PCF’s Motion for Summary Judgment, the trial court stated:
[A]t a trial against the PCF, Plaintiff would have the burden of proving what damages [were] caused and that the admitted malpractice caused damages in excess of $100,000. Graham v. Willis-Knighton Medical Center, 97-0188 (La. 09/09/1997), 699 So.2d 365. Despite eighteen years of litigation and discovery, Plaintiff has produced no evidence or expert testimony that the acts or omissions of the settling healthcare provider caused any injury that would not otherwise have occurred. Plaintiff could not carry her burden of proof, and therefore the PCF is entitled to judgment as a matter of law.

The PCF’s Summary Judgment Evidence

In support of its Motion for Summary Judgment, the PCF relied on an affidavit and expert report from Dr. John K. Willis, II. Dr. Willis has a medical degree from Duke University in 1972 and had post-doctoral training in pediatrics and child neurology from 1972 to 1978. Dr. Willis is the Section Head in the | ^Department of Pediatric Neurology at Ochsner Health System, and is board-certified in pediatrics, psychiatry, neurology, and neurophysiology.
Dr. Willis’s January 13, 2005 expert report is based on his independent medical examination of nine-year-old Dan’esia on August 23, 2004. Dr. Willis, who reviewed Dan’esia’s medical records from Children’s Hospital, noted that Dan’esia had been hospitalized there in the first month of life for “bacterial meningitis due to group B beta strep.” Dr. Willis described Dan’esia as a “perfectly normal,” “neurologically intact,” nine-year-old girl, “currently placed in gifted classes, who seemingly survived bacterial meningitis unscathed, a disorder she acquired in the first month of her life.” Dr. Willis concluded as follows: “There were no apparent neurological sequelae[4] .... I do not see any evidence here for neurological disease, and I thus [d]o no[t] see any reason to think that her episode of *429 bacterial meningitis has compromised her in any way.”
The PCF also relied on the deposition testimony of Dr. Patrice B. Evers, who is board-certified physician in general pediatrics, and who practices at the Tulane Pediatric Clinic, where Dan’esia was treated several times. Dr. Evers testified about two of her office visits with Dan’esia, once in 2003 for conjunctivitis, and again in 2012 for examination of a lump in Dan’esia’s breast. Dr. Evers also testified about an office visit in 2009 with another pediatrician at the Tulane Pediatric Clinic, in which Dan’esia complained of headaches, lightheadedness, dizziness, and weakness, and her teacher reported syncope, or “passing out.” Based on her review of Dan’esia’s medical records from these three | uvisits to the Tulane Pediatric Clinic, Dr. Evers testified that she saw no evidence of neurological deficits. Dr. Evers also stated that she had no reason to think that there was any “affect from [Dan’esia’s] episode of bacterial meningitis as an infant.”
Finally, the PCF submitted the deposition testimony of Dan’esia herself. In 2014, Dan’esia, then a student at Louisiana State University, was deposed. Dan’esia was asked about any causal connection between •her bout of meningitis as an infant and any subsequent medical conditions:
Q. Any healthcare provider tell you that any of your documented medical conditions, meaning that you went to a doctor to talk to them about it, was related to your bout of meningitis as an infant? A. No
Also, Dan’esia was asked about the timing of her treatment:
Q. The question is has any medical doctor ever told you that if you had been treated differently occurrences later in your life would have been different?
A. No.
Q. Has any nonmedieal doctor ever told you that?
A. No.
We find that this evidence presented by the PCF satisfied its summary judgment burden of showing the absence of an essential element of Ms. Williams’s claim, i.e., that the admittedly substandard conduct of the emergency room physician caused her damages in excess of $100,000.00 that she would not have otherwise sustained. Thus, the burden shifted to Ms. Williams to show that she will be able to satisfy her burden of proof at trial.

Ms. Williams’s Summary Judgment Evidence

In her opposition to the PCF’s motion for Summary Judgment, Ms. Williams submitted the expert opinion of Dr. Larry Lutwick. In his affidavit, Dr. Lutwick Instated that he'is currently a Professor of Medicine and Bio-Medical Scientist at the University of Western Michigan School of Medicine. Dr. Lutwick is board-certified in infectious diseases. Dr. Lutwick reviewed, inter alia⅛ Dan’esia’s medical records from Meadowcrest Hospital and Children’s Hospital.
Dr. Lutwick stated that, based on his review of the medical records and depositions, “it appears that Dan’esia did suffer a seizure disorder which was treated by physicians with Phenobarbital for' several years.” Dr. Lutwick stated that the “focal seizures” that Dan’esia experienced for several years after her hospitalization “were in [his] professional opinion related to and causally related to the infantile meningitis condition and delayed diagnosis.”
With respect to the specific issue of the physician’s admitted delay in diagnosing and treating Dan’esia’s infantile meningitis, Dr. Lutwick stated that “[i]t is undis *430 puted within the medical community and the specialty of infectious disease that the earlier meningitis is treated, the less likely it is to cause long-term side effects.” Dr. Lutwick also stated that “[it] is undisputed that rapid immediate treatment reduces the effects and delayed treatment results in worse [sic] permanent condition and medical sequelae.”
Dr. Lutwick’s conclusions were as follows:
Based on my review of these records in their totality, I believe it is more likely than not that Dan’esia has exhibited some of the long term sequelae related to meningitis and delay in treatment for her initial infection. It is well recognized that the delay in treatment results in more treatment, more sequelae, more problems. The totality of symptoms is significant and material in this analysis. If she had been properly treated earlier on in the infection process, it is more likely than not that she would not suffer all these long term effects.
[Emphasis added.]
Ms. Williams also submitted an affidavit and expert report from Dr. Marc Zimmerman, Ph.D., M.P., who holds a doctoral degree in Psychology, and is in |16private practice within the specialty of Psychology and Medical Psychology. Dr. Zimmerman conducted a psychological examination of eighteen-year-old Dan’esia on November 1, 2013; December 10, 2013; and January 20, 2014.
Dan’esia told Dr. Zimmerman that she had headaches and back pain starting at her left hip and going to her shoulder blade, which she had had since she was eight years old. She also complained of difficulty with focus and attention since middle school, and memory problems.
, After conducting a battery of tests, Dr. Zimmerman concluded as follows:
[Dan’esia] does demonstrate cognitive deficits. She appears to have an attentional problem and. memory deficits. Whether these can be attributed to her suffering meningitis is equivocal because of the lack of literature on the matter. However, from the literature reviewed, this type of impairment would be consistent with an individual who had suffered this infection.
Finally, Ms. Williams submitted the expert testimony of Dr. Charles Herring. Dr. Herring has a doctor of chiropractic degree from Palmer College of Chiropractic and is a Diplomat of the American College of Chiropractic Consultants. Dr. Herring examined 18-year-old Dariesia in December 2013. Dariesia reported to Dr. Herring that she had been diagnosed with “Group B Streptococcus Meningitis” at a very early age, and that she had experienced a seizure disorder earlier in life that was related to her meningitis and was treated with medications over several years. She complained of frequent stabbing pain in the lower back that would shoot up the spine to her lower cervical area. Dariesia also complained of constant aching of the entire spine, burning pain in the lower cervical and upper thoracic areas, and bilateral hip pain. Dan’esia told Dr. Herring that she had frequent headaches and had some hearing loss. Dariesia also reported 117that she had experienced these symptoms since at least middle school, and that they had progressively worsened.
Dr. Herring stated that, in preparing his report, he reviewed, inter alia, Dariesia’s medical records from Meadowcrest Hospital and Children’s Hospital. Dr. Herring reported that “based on her history of meningitis and the possibility of neurological and arthritis sequelae it appears her spinal pain complaints are a result of the meningitis and not some other condition.” [Emphasis added.] Dr. Herring *431 recommended further testing/evaluation to “differentially diagnose the causé of her symptoms and findings in relationship to meningitis or some other etiology.” '
In his affidavit, Dr. Herring concluded as follows:
The examination and tests I conducted, coupled with the review of the aforementioned medical records, deposition testimony, reports by healthcare -providers, and literature lead to medical opinion [sic] that there is substantial support of the conclusion that Dan’esia William’s [sic] current symptoms are a sequelae of the prior diagnosed condition of bacterial meningitis. [Emphasis added.]
Based on our rife novo review of the summary judgment record, we find that Ms. Williams has submitted sufficient evidence to establish the existence of a genuine issue of material fact as to whether the delay in treating her bacterial meningitis caused subsequent damages in excess of $100,000.00 that she would not otherwise have sustained. Specifically, Dr. Lutwick linked the delay in treatment of infantile meningitis with later long-term side effects, such as seizures, memory loss, headaches, lack of concentration, hearing problems, dizziness, and weakness. Dr. Lutwick also causally linked Dan’esia’s history of seizures to her infantile bacterial meningitis. Dr. Zimmerman causally linked her cognitive deficits to her infantile meningitis, Dr. Herring causally linked her back pain to lisher infantile meningitis. Most importantly, Dr. Lutwick stated that, had Dan’esia been properly treated earlier on in the infection process, it is “more likely than not” that she would not have suffered all of the long term effects. (Emphasis added.)
Based on the evidence as a whole, we find that reasonable- persons could disagree on the issue of causation and damages. Therefore, a genuine issue exists for trial. Accordingly, we reverse the trial court’s judgment granting the PCF’s Motion for Summary Judgment.
Assignment of Error No. 2:
Trial Court Erred in Denying Motion for New Trial
Ms. Williams argues that the trial court erred in denying her Motion for New Trial because “where causation of injury is demonstrated by opposing experts in a medical malpractice case, the extent of the damage is an issue for trial, not summary judgment.” Because we find that Ms. Williams has raised a genuine issue of material fact that precludes summary judgment, we do not address the denial of Ms. Williams’s Motion for New Trial.
Assignment of Error No. 3:
Payments for Future Medical Care and Related Benefits
Ms. Williams argues that the trial court erred in not awarding future medical expenses and related benefits in accordance with an affidavit submitted by her attorney, in which she attached true copies of bills and invoices for the medical treatment and care of Dan’esia after the initial injury/malpractice on July 3,1995. These medical bills total $133,232.06, and include hospital bills from Meadowcrest Hospital, where Dan’esia first visited the emergency room on July 3, 1995; Children’s Hospital, where the infant Dan’esia was diagnosed and treated for |19bacterial meningitis on July 4, 1995; and Tulane, where Dan’esia was seen at the Pediatric Clinic for headaches, dizziness, lightheadedness, and syncope.
La. R.S. 40:1231.3 governs awards for future medical care and related benefits. This provision “comprehends all past, present, and future medical and related care services necessitated by a qualified *432 health care provider’s malpractice — not just what is usually thought of as ‘future’ medical needs.” Kelty v. Brumfield, 93-1142 (La. 2/25/94), 633 So.2d 1210, 1217. This broad category is defined as “[a]ll reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, after the date of the injury.... ” La. R.S. 40:1231.3(B)(l)(a) (emphasis added).
Pursuant to La. R.S. 40:1231.3, the “fact-finder in a medical malpractice is charged with determining whether the patient is or is not in need of future medical care and related benefits and the amount thereof.” See Watkins v. Lake Charles Mem. Hosp., 13-1137, p. 8 (La. 3/25/14), 144 So.3d 944, 951. “Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits, as lpng as medical or surgical attention is reasonably necessary, the patient may make a claim to the PCF for all future medical care and related benefits directly or indirectly made necessary by the health care provider’s malpractice.” Id., 13-1137 at pp. 8-9, 144 So.3d at 951.
Because the issue of whether a patient is in need of future medical care and related benefits are “fact questions for the jury or judge,” Coleman v. Deno, 99-2998, p. 37 (La.App. 4 Cir. 4/25/01), 787 So.2d 446, 472, . at the trial on the merits, Ms. Williams will be afforded the opportunity to submit evidence of her past medical expenses, establish that future medical expenses are necessary, and |20set out their probable cost. See Hanks v. Seale, 04-1485, p. 16 (La. 6/17/05), 904 So.2d 662, 672. If the jury finds that Dan’esia is in need of future medical care and related benefits, the trial court will render a judgment accordingly. Thereafter, Ms. Williams may make a claim to the PCF for payment of medical expenses and related benefits.
CONCLUSION
For the reasons stated above, we convert this appeal to an application for supervisory writ and grant the writ. We affirm the trial court’s judgment denying the PCF’s Motion to Strike the Lutwick Affidavit. We reverse the trial court’s decision to grant summary judgment in favor of the PCF, and do not address the trial court’s denial of Ms. Williams’s Motion for New Trial. The matter is remanded to the trial court for further proceedings.
APPEAL CONVERTED TO WRIT; WRIT GRANTED; REVERSED AND REMANDED
TOBIAS, J., DISSENTS.
DYSART, J., CONCURS, WITH REASONS.

. The record on appeal sometimes spells Dan’esia’s given name , as “Dane'sia.” We have spelled her name herein as Dan’esia.

. We note that the trial judge permanently left the bench on December 31, 2014 after losing his reelection bid, and was ordered by the Louisiana Supreme Court to return and render written reasons for judgment, which he did.

. Effective June 2, 2015, the MMA was redes-ignated as La. R.S. 40:1231.1-1231.10.

. "Sequelae” is the plural of sequela, which means "[a] condition following as a consequence of a disease.” See Stedman’s Medical Dictionary 1752 (28th ed. 2006). See also Black’s Medical Dictionary 639 (41st ed. 2006) (“The term applied to symptoms or effects which are liable to follow certain diseases.”).